[Crim. No. 32722. Second Dist., Div. Five. Jan. 10, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ORLANDO BROOKS, Defendant and Appellant.

**COUNSEL**

Herbert F. Blanck, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

STEPHENS, J.—Defendant appeals his conviction of armed robbery on the ground that irrelevant and prejudicial hearsay evidence was erroneously admitted by the court under the state of mind exception to the hearsay rule.

Defendant was charged by information with robbery, a violation of Penal Code section 211. It was further alleged that defendant used a handgun while committing the offense, a violation of former Penal Code sections 1203.06, subdivision (a)(1), and 12022.5. Defendant pleaded not guilty. His first jury trial was declared a mistrial after the jurors were unable to reach a verdict. At his second jury trial, defendant was found guilty of first degree robbery; the use allegations were also found to be true. Probation was denied and defendant was committed to the California Youth Authority for the term prescribed by law. This appeal followed.

Around noon on June 30, 1976, defendant signed into a medical clinic, located in a Los Angeles shopping center, as a walk-in patient for treatment of a finger he injured while practicing karate. He was told to return with a parent to sign the necessary authorization papers for treatment. About an hour later, defendant brought his stepfather to the clinic. While his stepfather completed the paperwork, defendant stepped outside to talk with some friends he saw in the parking lot. After talking with Nadine Harris, Larry Taylor and Jerry Israel for about 15 minutes, defendant went with Jerry to a bakery in the same shopping center for an ice cream. Then defendant returned to the clinic. His vital signs were taken there at 2:05 p.m. Defendant testified that he was then placed in an examining room to wait for the doctor, who treated him sometime after 2:30 p.m.

Between 2 and 2:15 p.m., the bakery was robbed. No customers were in the bakery at the time. Shirley Mitchell, a bakery employee, was collecting money at the counter when defendant called out to her and

told her to give him the money from the cash register in a bag. He was pointing a pistol at her. Defendant's friend Jerry stood outside acting as a lookout. Mitchell gave defendant about $100 in cash and food stamps from the register; then he ordered her to lie down on the floor. When she got up a few minutes later, he was gone. Another bakery employee, Audrey Blount, had looked up from the cake she was making and observed the robbery in progress.

A day after the robbery, Nadine Harris came into the bakery as a customer. Mitchell had seen Harris talking to defendant and Jerry in the parking lot before the robbery. At Mitchell's request, Harris drove Mitchell to defendant's house; Mitchell wrote down the address and gave it to the police. During police investigation of the robbery, both Mitchell, the victim, and Blount, the other eyewitness, identified defendant as the robber from a group of photographs they were shown. At a police lineup two weeks later, Mitchell again positively identified defendant as the perpetrator but Blount did not.

At trial, Mitchell steadfastly maintained her identification of defendant as the robber. Blount, however, again failed to identify defendant and testified as quoted below that she could not identify defendant at the time of the police lineup because she was confused.

"[*Prosecutor*]: Would you tell us what it was that you felt at that time?

"[*Ms. Blount*]: See, it was never made clear for me and Shirley who was [defendant] and who was Jerry. We just picked out the people, and we were never told, see, the thing was that they kept—had—they tried to tell us that we could have mistaken [defendant] for Jerry or Jerry for [defendant]; that they looked that much alike. See, that was the whole holdup and the problem of the whole thing.

"[*Prosecutor*]: Did that have some affect on you—you at the time that you went in to view the lineup?

"[*Ms. Blount*]: Well, I didn't want to say that it was the one person and it was the wrong guy.

"[*Prosecutor*]: So as a result of them talking to you you felt more reluctant to say that that was the person?

"[*Ms. Blount*]: Yeah, because, it put some doubt in my mind whether it was him or not."

When the prosecutor attempted to elicit from Blount that her confusion was due to Shirley Mitchell's telling her that defendant's mother came into the bakery to "harass" Mitchell and try to change their minds about her son being the robber, the court granted a defense motion to strike this line of questioning.[1] The court then instructed the jury that what Blount may have heard was not offered for whether it was true but only to show her state of mind.

The prosecution then called Nadine Harris to testify. She was asked:

"[*Prosecutor*]: Miss Harris, are you somewhat uneasy right now?

"[*Ms. Harris*]: Yes.

"[*Prosecutor*]:. Is there anything that happened to you that makes you feel that way?

"[*Ms. Harris*]: Yes.

"[*Prosecutor*]: Would you tell us please what that is?

"[*Ms. Harris*]: I was threatened." The court immediately dismissed the jury and held a "402 type hearing" to determine whether threats were made to dissuade the witness from testifying and whether the evidence would be admissible to show her state of mind. The prosecution conceded that there was no evidence defendant had anything to do with his girlfriend's threat to Nadine Harris at school and in the hall outside the courtroom to "kick her butt" if defendant went to jail. The court did find that defendant was not present when these remarks were made to Harris. When the jury returned, the judge allowed the prosecutor to question Harris extensively about the alleged threats "in order to bring out in a way that will allow the defendant also to rebut any negative implications" that defendant was connected with the threats. He instructed the jury that the court had allowed these questions "for the limited purpose that it has a bearing on the state of mind of this witness . . . ."

■ Defendant contends on appeal that the above testimony of Blount and Harris was irrelevant and prejudicial hearsay evidence erroneously admitted under the state of mind exception to the hearsay rule. The prosecution counters that these witnesses' statements were not

---

[1]However, the defense opening statement had ascribed Blount's confusion to improper police procedure or conduct during the lineup. Thus, it is not clear from the record and testimony above whether "they" and "them" referred to the police or to defendant's parents as the cause of Blount's inability to identify defendant at the lineup; only the fact of her confusion remained in evidence.

hearsay because they were admitted solely for a nonhearsay purpose and, further, that the trial court's cautionary instructions eliminated any possibility of prejudice to defendant. █ Additionally, the prosecution argues that because defense counsel failed to object to Harris' testimony, the hearsay issue may not be raised for the first time on appeal.

This last contention lacks merit because in the case before us, the court called a hearing to consider exclusion of the evidence immediately after Harris said, "I was threatened." Defense counsel had neither the opportunity nor the need to object under these circumstances. Further, the defense had vigorously objected to the prosecutor's previous questions of eyewitness Blount, at which time the court ruled that evidence was to be considered only as it revealed her state of mind. Thus, the second time such an issue arose, it was clear how the court intended to rule and another objection was unnecessary. "Where a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising in the examination of other witnesses; and his silence will not debar him from having the exception reviewed." (*Green* v. *Southern Pac. Co.* (1898) 122 Cal. 563, 565 [55 P. 577].)

There are only two ways the testimony of these witnesses could properly be admitted into evidence: either as nonhearsay or as statements falling within the state of mind exception to the hearsay rule. Otherwise, the testimony would be inadmissible hearsay erroneously received into evidence. █ First, we note that the state of mind exception to the hearsay rule does not apply to this case because the statute governing that exception, Evidence Code section 1250,[2] deals with admissibility of *a statement* offered to prove a declarant's state of mind or conduct. We are not here concerned with any declarant's statement which is evidence of a state of mind. The testimony at issue was offered to show which *witnesses'* statements to believe.

[2]Evidence Code section 1250 provides: "§ 1250. Statement of declarant's then existing mental or physical state.

"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

■ Since the state of mind exception to the hearsay rules does not apply to these facts, we next inquire whether the testimony can be deemed nonhearsay. As to witness Blount, we hold that it was nonhearsay because it was offered for a proper credibility purpose under Evidence Code section 780.[3] After the robbery, Blount had initially identified defendant as the perpetrator of the crime. Her later retraction of that identification presented a credibility issue on which the jury was entitled to hear evidence in order to resolve or understand the cause of her inability to make the identification in court.

■ We are however unable to overcome the initial relevancy hurdle to the threat testimony of witness Harris. No inconsistent testimony had preceded the prosecutor's questioning of Harris; there was no issue of credibility (or "state of mind" as the trial court termed it). Hence, the "threat" evidence was immaterial to any issue and irrelevant to the case; furthermore, the *fact* evidence which this witness produced was likewise irrelevant. Perhaps the prosecutor anticipated some credibility problem to develop though the lack of relevancy of this witness' testimony strongly suggests the presentation of this witness was solely to call the jury's attention to the threat. He jumped the gun in any event in his production of such evidence. As a result, testimony extremely prejudicial to defendant was erroneously admitted into evidence.[4]

Although the court gave specific cautionary instructions and read CALJIC No. 2.05[5] as requested by defendant the error was not cured by these instructions. In fact, it left the jury free to find that defendant was connected with the threats.

[3]Section 780, Evidence Code, reads in relevant part as follows: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . (f) The existence or nonexistence of a bias, interest, or other motive. . . . (j) His attitude toward the action in which he testifies or toward the giving of testimony."

[4]Such evidence would be admissible against defendant as showing consciousness of guilt only if the threats were authorized by him or made in his presence. (*People* v. *Terry* (1962) 57 Cal.2d 538, 566 [21 Cal.Rptr. 185, 370 P.2d 985], cert. den. (1963) 375 U.S. 960 [11 L.Ed.2d 318, 84 S.Ct. 446].) The court noted to counsel prior to the introduction of the testimony that there was no proof at all that defendant was connected to the threats.

[5]CALJIC No. 2.05 reads as follows: "If there is evidence that efforts to procure false or fabricated evidence were made by another person on behalf of the defendant, you may not consider this as tending to show the defendant's consciousness of guilt unless you find that the defendant authorized those efforts."

■ The final question is whether this prejudicial error requires reversal. *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], compels reversal where the appellate court, after a thorough review of the record, is of the opinion that a result more favorable to defendant would have been reached in the absence of the error. In the instant case, defendant's first trial, without the prejudicial error which occurred at this second trial, had ended in a hung jury. We could thus avoid reversible error only if steadfast identification by one witness (Mitchell) be held sufficient for the jury to reach its guilty verdict; however, her identification of defendant did not convince the jury the first time. Here, in the second trial, the problem was compounded by prejudicial testimony which could have confused the issues and misled the jury. We believe, under the circumstances, that conviction resulted from prejudicial and, hence, reversible error.

The judgment is reversed.

Kaus, P. J., and Hastings, J., concurred.