[Crim. No. 19982. First Dist., Div. Three. Jan. 22, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
WAYNE CURTIS LYBRAND, Defendant and Appellant.

4

---

**COUNSEL**

Jeffry Glenn, under appointment by the Court of Appeal, and Berman & Glenn for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PANELLI, J.**\*—Appellant Wayne Curtis Lybrand was charged by information with the kidnaping (Pen. Code, § 207),[1] forced oral copulation (§ 288a, subd. (c)), and rape (§ 261, subd. 3) of Ms. D. In addition, it was alleged that he had used a knife in the commission of each of the offenses (§ 12022, subd. (b)), and that he had three prior felony convictions (§ 667.5, subd. (b)).

Appellant admitted the prior felony convictions. A jury trial resulted in his conviction on all counts and in findings that the use allegations were true. He was sentenced to nine years in state prison.

Appellant advances the following contentions on appeal:

1. The trial court erred in denying his motion to suppress a knife and a car rental agreement retrieved from the glove compartment of the automobile driven by him on the night of his arrest.

2. Admission of evidence that the victim had been threatened regarding her testimony was prejudicial error.

3. The trial court erred to his prejudice when it refused to give his proffered jury instructions on eyewitness identification.

4. As a matter of law, the evidence was insufficient to sustain his conviction.

We affirm the judgment.

As appellant questions the sufficiency of the evidence, we set forth in some detail, in, as is our role, the light most favorable to the judgment. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

Between 9 and 9:30 p.m. on the night of May 17, 1978, the victim, Ms. D., went to a bar, the Bay Hill Lounge in San Bruno. There she met two friends. Around 11:30 p.m., appellant and another man entered

---

*Assigned by the Chairperson of the Judicial Council.
[1]Unless otherwise indicated, all citations are to the Penal Code.

the bar and some time after that (approximately midnight or 12:30 a.m.), appellant asked Ms. D. to dance. She did so and conversed with him briefly; however, they did not introduce themselves to one another. Later, he asked her to dance again and she declined.

There was no further contact between them in the bar, but when Ms. D. left, she saw appellant pull up and stop. Ms. D. got in her car and drove home, observing that appellant's car was following her. When she arrived at her home, she pulled her car into her garage, after opening the garage door with an electric opener. She closed the door by the same mechanism and as she started to get out of her car, she was confronted by appellant. He had a knife and ordered her to open the garage door once again. When she did so, the garage light came on. Appellant stuck the knife into her ribs, forcing her to go with him to his car.

For the next hour and fifteen minutes, Ms. D., against her will, remained with appellant. While he drove, at his order and compulsion, she orally copulated him. When he parked the car, he sodomized her and forced her to engage in a variety of aberrant sexual acts, as well as intercourse and oral copulation, the details of which are not necessary to this opinion. As she complied with these sexual demands, appellant proceeded to simultaneously go through her purse. He periodically struck her when she did not do as he commanded and she lost consciousness twice. Her clothes were stained with blood and fecal matter. Her face was bruised and cut. Eventually, appellant again began to drive and finally let Ms. D. out of the car. As she left, appellant told her several times "never to report this, that he had a lot of bad friends," and never to go to the Bay Hill Lounge again. Following the foregoing incidents, Ms. D. returned home and called her friend Ms. M., who had been with her inside the Bay Hill Lounge. Thereafter, she sought medical attention and reported to the police.

Ms. D. had no doubt that appellant was her assailant. She had positively identified him at the preliminary hearing on June 15, 1978, and picked him out of a lineup on June 19, 1979.[2] He was positively identified by her friend, Ms. M., as the man with whom Ms. D. danced on the night in question.

---

[2]Appellant had originally pleaded guilty to the rape charge and its use allegation and was sentenced accordingly. However, the pleas were set aside and the original charges reinstated when his habeas corpus petition was granted on April 27, 1979.

Ms. D. did not see appellant again until she returned to the Bay Hill Lounge around midnight on the morning of June 4, 1978. She recognized appellant immediately and had a friend call the police. When Officer Nicolopulos, in uniform, entered the bar, appellant saw him and quickly got up and went out the back door where Reserve Officer Mackinna, who had positioned himself outside the back door, captured him. Ms. D. positively identified appellant as her assailant, and he was arrested.

He was taken to the police station, *Mirandaized* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and he agreed to talk to the officers. He admitted to Officer Nicolopulos that he might have danced with Ms. D. on the night in question, but denied the subsequent events. Initially, he gave the officers permission to search the Thunderbird car which he had driven to the lounge on the night of his arrest,[3] saying that the only thing the officers would find would be a knife in the glove compartment. When one officer expressed interest in the knife, appellant quickly withdrew his consent. Nonetheless, Officer Cosley went alone to the car and retrieved the knife and a rental agreement for the car from the glove box. At trial, Ms. D. identified the knife as the one used in the assault, having previously described to the officers the distinctive curved tip of the knife.

Still other evidence connected appellant as the assailant. Ms. D. had discovered that her Mastercharge card was missing from her purse. She identified two credit card slips as having been charged to her missing card by someone other than herself. One bore her name, the other that of appellant. One from Woolworth's was dated May 17, 1978; however, the custodian of records for that store testified that the date was in error and that in fact the transaction involved actually took place on May 18, 1978. A handwriting expert compared the signatures of exemplars of appellant's writing and concluded that at least one of the slips had been signed by appellant.

Moreover, when appellant was arrested, he wore a leather wrist band with the name "Red" on it. Ms. D. identified it at trial, though not positively, as the one worn by her assailant on the night of the assault, recalling both the band itself and the writing.

---

[3]The car in which the acts complained of by Ms. D. occurred did not match the description of the searched vehicle. The described vehicle was never found.

Appellant's defense was one of alibi. He contended that he had been at a C.B. club meeting in Alameda on the evening of May 17, 1978, with close friends, the Maldonados. Afterwards, he and Glen Maldonado, he said, went to the Bay Hill Lounge around 12:45 a.m. and left around 1:20 a.m., returning home to Pacifica. Contrary to the statement given to police on the night of his arrest, he testified he never saw Ms. D. He further testified he never left the Maldonado home after returning there. The Maldonados confirmed this story and both said that they would have heard him leave the house again if he had done so. Glen maintained that the knife was his.

Appellant admitted using Ms. D.'s credit card, but said that he had obtained it on May 15, 1978, from a friend, Craig Mason, who found it in the men's restroom of the Bay Hill Lounge. Appellant said that he had used the card at Woolworth's on May 17, and not May 18. Craig Mason confirmed his story.

### 1. *The Search of the Thunderbird Glove Box*

Appellant argues that the knife found by police during the search of the glove box of the Thunderbird should have been suppressed as the product of an illegal search. Appellant's section 1538.5 motion in this regard was denied by the lower court.

The facts elicited at the motion to suppress were these: Officer Nicolopulos, Reserve Officer Mackinna, and Officer Cosley were present when appellant mentioned the knife and withdrew his consent to search the car. This conversation took place at the police station. Officer Cosley went back alone to the parking lot of the Bay Hill Lounge at approximately 1:30 a.m. in an attempt to locate and search the car.

When asked what the exigencies were at the time, Officer Nicolopulos indicated that "We determined that the car would be a fleeting object. It's—There was no way we could determine the car would be there, at any given point in time by the time we got up there." Nicolopulos did not recall whether appellant indicated to whom the car belonged, and he did not know whether anyone else had keys to the car. He also indicated "It would have been difficult to secure the vehicle itself. The vehicle could have been moved. Anything could happen to the car" and "I had no idea that they had a key to the car, whether there was somebody else in the lounge with Mr. Lybrand, the hour in question, and the fact that the vehicle at the time didn't fit the description

of the car that was used in the commission of the act." Nicolopulos was not apparently aware that the car was a rental car. Cosley, however, recalled that appellant had indicated that the car was a rental car. Cosley found the vehicle at approximately 1:30 a.m. When asked why he did not impound the car, he answered, "We—I felt it was a consensus that it was a possibility that the car could be moved by a friend. And so we felt that expediency in searching the vehicle at the time was the best thing to do." Cosley also did not know of anyone specifically who had keys to the vehicle besides himself. He was asked if he "had exclusive control of the car," and answered "With the keys, yes...."

Appellant agrees that there was probable cause to search the glove compartment. (*Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557 [128 Cal.Rptr. 641, 547 P.2d 714].) He contends, however, that the police officers should have first obtained a warrant. He argues further that the prosecution failed to show that there were exigent circumstances which made it impractical or impossible to obtain a warrant. Specifically, he maintains that the police could have impounded the car and obtained a warrant. We disagree. Appellant does not articulate his argument in any detail (he cites *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022]; *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476]; *People* v. *Dumas* (1973) 9 Cal.3d 871 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514]; and *People* v. *Jochen* (1975) 46 Cal.App.3d 243 [119 Cal.Rptr. 914]). He essentially asks this court to extend the "securely-within-police-control" rationale of the "closed container" decisions to automobile searches generally. (See also *People* v. *Dalton* (1979) 24 Cal.3d 850 [157 Cal.Rptr. 497, 598 P.2d 467].) We decline to do so.

This court recently observed in the trunk search context: "That any exigency greater than that supplied by the fact that an automobile is stopped on a public street is necessary before an automobile trunk may be searched is certainly not self-evident from the facts of either United States or California Supreme Court cases involving trunk searches." (*People* v. *Vodak* (1980) 105 Cal.App.3d 1014, 1017 [164 Cal.Rptr. 785].) The same statement may be made about glove compartments, *Jochen, supra*, 46 Cal.App.3d 243, notwithstanding. (See also *People* v. *Koehn* (1972) 25 Cal.App.3d 799 [102 Cal.Rptr. 102] and *People* v. *Wright* (1977) 72 Cal.App.3d 328 [140 Cal.Rptr. 98].)[4] Similarly, we are mindful of *People* v. *Gott* (1979) 100 Cal.App.3d 1 [160 Cal.Rptr.

307]. It and *Jochen, Koehn* and *Wright*, involve distinguishable factual situations in which, for example, there were large numbers of officers present at the location of the car so that "there was no reason to suspect that the car would not remain safely in police custody until it was impounded and removed to the police garage, and a warrant was obtained." (*Jochen, supra*, 46 Cal.App.3d at p. 248, fn. omitted.)

Here we have one officer knowing that the car in question is a rental, but not knowing the renter, located in a parking lot at 1:30 a.m., open and accessible to the general public. It is clear from the evidence that it was necessary to search the car immediately. We believe these facts presented exigent circumstances to the officer, justifying the search in question, and removing the search from the prohibition expressed in *Jochen.*

■ "A proceeding under [Penal Code] section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, *weigh evidence and draw factual inferences*, is vested in the trial court. ■ On appeal all presumptions favor proper exercise of that power, and the trial court's findings— whether express *or implied*—must be upheld *if* supported by *substantial* evidence. [Citations.]" (*People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585], italics added.) Appellate review of a ruling made under section 1538.5 is limited to whether there is substantial evidence in the record to justify such a ruling. (*People v. Sutton* (1976) 65 Cal.App.3d 341 [134 Cal.Rptr. 921].)

---

[4]We read *Arkansas v. Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586] as continuing the distinction between the *Chambers/Carroll* "automobile exception" (*Chambers v. Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975] and *Carroll v. United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790]) and the *Chadwick* (*United States v. Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476]) lines of cases. (*Arkansas v. Sanders, supra*, at p. 757 [61 L.Ed.2d at p. 240].) In analyzing the exigency problem, the majority noted (at p. 763 [61 L.Ed.2d at pp. 244-245]) that "the exigency of mobility must be assessed at the point immediately before the search—after the police have seized the object to be searched and have it securely within their control." To seize upon the "securely within their control" language to do away with the "automobile exception" ignores the footnote following this comment (fn. 10): "The difficulties in seizing and securing automobiles have led the Court to make special allowances for their search." (Similarly, we do not believe *Minjares* or *Dalton* makes the extension suggested by appellant.)

Plainly, denial of the motion was supported by substantial evidence.[5]

Finally, we note that even if we were to engage in an analysis which led us to a conclusion that it was error to deny the motion to suppress, we find such error harmless under either the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], cert. den. 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70]) or *Chapman* (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]) tests.

## 2. *Evidence of Threats to Ms. D.*

■ Ms. D. testified that as she was about to leave the court building after the preliminary hearing, she saw three men leaning against the hood of her car. These men had been in the courtroom at the time of her preliminary hearing testimony. The police told her that one of the trio was appellant's father, and another his brother. She went home with a police officer. On other occasions, she received two phone calls from a man who said he was a friend of appellant, warning her not to testify. The person knew her middle name which was not listed in the phone directory but was shown on the complaint charging appellant.

Appellant objected to this evidence below, and now contends that its admission was error. He argues that the threats received by Ms. D. were not connected to him and were thus irrelevant. Again, we disagree.

Evidence of threats to a witness is generally admissible on either or both of two theories. First, it is relevant on the question of the witness' credibility. (Evid. Code, § 780; *People v. Green* (1980) 27 Cal.3d 1, 20 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Brooks* (1979) 88 Cal. App.3d 180, 187 [151 Cal.Rptr. 606]; *People v. Manson* (1976) 61 Cal. App.3d 102, 145 [132 Cal.Rptr. 265].) Second, it may be admissible as tending to show a defendant's consciousness of guilt *if* the threats are linked sufficiently to the defendant. (*People v. Terry* (1962) 57 Cal.2d 538, 565-566 [21 Cal.Rptr. 185, 370 P.2d 985]; *People v. Brooks, supra*, 88 Cal.App.3d at p. 187, fn. 4.)

While Ms. D.'s testimony concerning the men by her car and the threatening phone calls was not specifically offered by the prosecutor on

---

[5]We note parenthetically that, even if our role were to make a de novo review of the evidence, based on the facts hereinbefore stated, our conclusion would be no different from that reached below.

the issue of credibility, plainly it was admissible on that ground and was relevant. Additionally, it was properly admitted as tending to show appellant's consciousness of guilt. When Ms. D. left appellant's car, he told her never to report the incident, never to go to the Bay Hill Lounge again, and that he had a lot of bad friends. The telephone caller identified himself as a "friend" of appellant. The caller knew the victim's middle name. The individuals by the victim's car after the preliminary hearing had been in the courtroom during the hearing and two were appellant's father and brother.

Evidence of a defendant's connection to threats may be shown by circumstantial evidence. (*People v. Terry, supra*, 57 Cal.2d at pp. 565-566.)[6] Here, the circumstantial evidence was sufficient to warrant the admission of the testimony. Moreover, assuming arguendo that the evidence was erroneously admitted, the error was harmless. (*People v. Watson, supra*, 46 Cal.2d 818.) The victim was thoroughly cross-examined on the facts of the incidents, and the fact of the threats was again otherwise admissible. The jury was instructed that efforts to procure false or fabricated evidence by a third person could not be used to show appellant's consciousness of guilt unless the jury found that he had authorized the efforts. (CALJIC No. 2.05 (1979 revision).)

### 3. *Jury Instructions*

■ Appellant proposed three "*Guzman/Sears*" (*People v. Guzman* (1975) 47 Cal.App.3d 380, 386-387 [121 Cal.Rptr. 69]; *People v. Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847]) instructions. He contends that the court's refusal to give them was prejudicial error. We disagree.

California courts have concluded that a criminal defendant is entitled to instructions which focus the attention of the jury on evidence from which a reasonable doubt might be engendered, including identification

---

[6]In *Terry*, the Supreme Court held admission of threats to be error during the penalty phase of a murder trial, finding the circumstantial evidence of that defendant's connection to the threats insufficient. There, the witness had testified that the defendant told him, """If you get any ideas about talking, I will take you with me."" (*Terry*, at p. 565.) The threat came after the guilt phase of the trial and was a telegram reading, "'Does your cigarette taste different, lately? Switch from hots to Kools,'" and was signed "'Lucky.'" (*Terry*, at p. 565.) It was sent by the wife of the brother of the defendant's wife. Plainly, the connection between the defendant and the threat was tenuous.

instructions. (*People* v. *Hurley* (1979) 95 Cal.App.3d 895, 900 [157 Cal.Rptr. 364]; *People* v. *Guzman, supra,* 47 Cal.App.3d at p. 387.) Appellant relies on *Guzman,* but there, unlike his own trial, no instruction linking identification to the concept of reasonable doubt was given. Later cases have held that CALJIC Nos. 2.20 and 2.91, which are given, are sufficient to focus the jury's attention with regard to the People's burden on identity. (See *People* v. *Hurley, supra,* 95 Cal. App.3d at p. 901; *People* v. *Kelley* (1977) 75 Cal.App.3d 672, 679 [142 Cal.Rptr. 457]; *People* v. *Boothe* (1977) 65 Cal.App.3d 685, 690 [135 Cal.Rptr. 570], overruled on other grounds in *People* v. *Brigham* (1979) 25 Cal.3d 283, 292 [157 Cal.Rptr. 905, 599 P.2d 100]; *People* v. *Smith* (1977) 67 Cal.App.3d 45, 49 [136 Cal.Rptr. 387]; *People* v. *Vindiola* (1979) 96 Cal.App.3d 370, 386 [158 Cal.Rptr. 6]; *People* v. *Blair* (1979) 25 Cal.3d 640, 663 [159 Cal.Rptr. 818, 602 P.2d 738] (no duty to instruct *sua sponte*).) More recently, however, *Guzman* was resurrected in *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826]. There the Supreme Court said: "Appellant Nichols also contends that the trial court committed prejudicial error in refusing to give his requested instructions concerning proof of identity beyond a reasonable doubt. Under the case law, it is error to refuse to give an instruction requested by a defendant which 'directs attention to evidence from . . . which a reasonable doubt of guilt could be engendered.' (*People* v. *Sears* (1970) 2 Cal.3d 180, 190. . . .) This applies with equal force to a refusal to give a requested instruction which deals with identification in the context of reasonable doubt. (*People* v. *Guzman, supra,* 47 Cal. App.3d at p. 387; *People* v. *Roberts* (1967) 256 Cal.App.2d 488, 492-494. . . .) [¶] Nichols' proposed instruction No. 5 was identical to one of the instructions which was found to be too long and argumentative in *Guzman.* (See *People* v. *Guzman, supra,* 47 Cal.App.3d at p. 387.) Further, some of the factors highlighted by the instruction have no application to the present case. Although the trial court did not err in refusing to give the instruction as written, it should not have refused to tailor the instruction to the facts of this case. However, this error was not prejudicial since the trial court did read to the jury CALJIC No. 2.91, as modified at Nichols' request, and CALJIC No. 2.20. In the future, the trial courts should consider and give appropriate instructions involving reasonable doubt and eyewitness identification. (See *People* v. *Sears, supra,* 2 Cal.3d at p. 190.)" *People* v. *Hall, supra,* 28 Cal.3d at pp. 158-160, fns. omitted.) The *Hall* rule is explicitly prospective only. Thus, here it was not error to refuse the instructions. Additionally, as in *Hall,* any error was harmless since CALJIC Nos. 2.20 and 2.91 were given.

### 4. *Sufficiency of the Evidence*

■ "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson, supra,* 26 Cal.3d at p. 578.)

■ The evidence of appellant's guilt is overwhelming. Appellant's contention has no merit and deserves no discussion.

The judgment is affirmed.

Scott, Acting P. J., and Barry-Deal, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 25, 1981.