[Crim. No. 17089. Fourth Dist., Div. Three. Feb. 29, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN EDWARD COATES, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and David J. Estrada, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John W. Carney and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CROSBY, J.**—John Edward Coates was convicted of robbery (Pen. Code, § 211) and burglary (Pen. Code, § 459) with use of a firearm (Pen. Code, § 12022.5).

I

On May 20, 1982, Beverly Ann Jeter was a clerk on duty at Hanshaw's Liquor Mart in Midway City. Also in the store was a niece visiting Ms. Jeter from Illinois. At approximately 10 p.m., a man entered and requested a carton of Winston "100" cigarettes and a bottle of Smirnoff red label vodka. When Jeter placed the items on the counter, the man displayed a revolver and said, "I hate to do this but empty the drawer."

Jeter placed the money on the counter and lifted the drawer to show there was no money below it. The robber placed the money in the bag containing the liquor and cigarettes and before departing said, "Give me a couple minutes."

To investigating officers, Jeter described the robber as a white male, approximately 45 years old, 5 feet 10 inches tall with auburn hair, wearing blue pants and a short sleeve shirt. He wore dark sunglasses and a white fishing-type hat with a blue band; the brim was pulled down to the top of the glasses. She saw his face below the glasses in particular detail. His nose was medium and wide with flared nostrils. His lips were thick and his neck had a ruddy complexion. She also observed a moustache and side burns, which were "auburn," but she could not determine eye color because of the sunglasses and noticed no scars or tattoos.

About a month later, Jeter and her niece were shown a photo lineup; and Jeter selected Coates' picture. The niece did not testify at trial, so the record is silent as to whether she made an identification. Curiously she was not

produced at trial by either side, although she stood within five feet of the robber according to Jeter.

On July 7, 1982, Orange County Sheriff's deputies served arrest and search warrants on Coates at his residence in Rowland Heights in Los Angeles County. The officers searched the residence and Coates' vehicle but found no evidence linking him to the robbery, specifically no blue slacks, no white hat with blue stripes, no sunglasses, no handguns, no Winstons, and no vodka.

Three fingerprints and a partial palm print "lifted" from Hanshaw's counter were compared to Coates' prints. There was no match.

On July 15, 1982, Jeter attended an in-person lineup at the Orange County jail in which the participants repeated phrases used by the robber. Jeter identified Coates, who was 42 years of age with auburn hair and moustache, although she noted he appeared paler and heavier and had different length hair and a thinner moustache. She apparently did not recognize his voice.

At trial, Jeter repeated her identification of Coates. On direct examination she said the market was well lit and Coates was in the store for five to six minutes total and remained approximately three minutes after producing the revolver. On cross-examination she admitted 20-24 seconds was a "fair estimate" of the total time she observed the robber's face. She conceded she saw no scars or tattoos on the robber and said with respect to Coates' voice at the lineup, "I wasn't impressed by his tone of voice as something in remembering him in particular."

Darlene Deal, Coates' girl friend of over four years and mother of his child, testified he worked as a cook in May 1982 and had Thursdays and Fridays off. She had no particular memory of Thursday, May 20, but said their invariable routine was to pick up Coates' check and cash it to buy groceries. They would then go to the beach at Huntington Beach where they would drink beer until late in the evening, occasionally staying all night. On one occasion they spent the night at a friend's home in Midway City located about a block from Hanshaw's, but she believed that occurred several weeks after May 20.

She also confirmed Coates did not own or wear blue slacks, a white hat with blue stripes, or sunglasses. He had not possessed a handgun for several years to her knowledge. She said he drank beer, not vodka, and smoked Salems, not Winstons. She also described, and the jury was allowed to view, a scar on Coates' jaw and scarring on his inner arms, as well as tattoos

located five inches above the right elbow, on the top of the right forearm, and on each side of the left forearm.

## II

The defense offered two special instructions. Special instruction No. 1, which is set forth in the margin, was drawn from *United States* v. *Telfaire* (D.C. Cir. 1972) 469 F.2d 552[1] and directs the jury to specific factors in determining whether eyewitness identification has met the reasonable doubt standard. Special instruction No. 2 provides, "Law enforcement agencies of all types have pictures and fingerprints of a great number of people who have never been associated with any type of criminal activity. You should not consider how or why Mr. Coates' picture was obtained by the police in this case, nor should you draw any inference that Mr. Coates was engaged in any criminal activity by the fact that his picture was included in the 6-29-82 photographic line-up." Both instructions were rejected; the record does not disclose the reason. During deliberations, the circumstantial evidence and reasonable doubt instructions were reread at the jury's request.

---

[1]Special instruction No. 1 reads: "One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Government has the burden of providing identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty. [¶] Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later. [¶] In appraising the identification testimony of a witness, you should consider the following: [¶] (1) Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender? [¶] Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past. . . . [¶] (2) Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account both the strength of the identification, and the circumstances under which the identification was made. [¶] If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see defendant, as a factor bearing on the reliability of the identification. . . . [¶] (4) Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony. [¶] I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty." (*United States* v. *Telfaire, supra,* 469 F.2d at pp. 558-559.)

The Attorney General defends the ruling as to the first instruction chiefly on the ground it omitted two significant statements contained in the model instructions set forth in *Telfaire*. The *Telfaire* instruction included, "You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness" and "In general, a witness bases any identification he makes on his perception through the use of his senses. Usually the witness identifies an offender by the sense of sight—but this not necessarily so, and he may use other senses." (*Id.*, at p. 558.)

We are told the omissions reduce the proffered instruction to an unfair and misleading statement of law, since Jeter picked Coates' picture and person from a group of others and used the recognition of his voice as part of the identification process, although to a lesser degree than the visual observation. (*People* v. *Adamson* (1946) 27 Cal.2d 478, 492 [165 P.2d 3], affd. *sub nom. Adamson* v. *California* (1947) 332 U.S. 46 [91 L.Ed. 1903, 67 S.Ct. 1672, 171 A.L.R. 1223], overruled in part on other grounds, *Malloy* v. *Hogan* (1964) 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489].) It is also claimed other instructions given by the court covered the matter adequately and any error incurred by failing to give special instruction No. 1 was harmless. (*People* v. *Lybrand* (1981) 115 Cal.App.3d 1, 12-13 [171 Cal.Rptr. 157]; *People* v. *Glaude* (1983) 141 Cal.App.3d 633, 641 [190 Cal.Rptr. 479].)

Coates relies on *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826], which held a similar "proposed instruction . . . was identical to one of the instructions which was found to be too long and argumentative in *Guzman*. (See *People* v. *Guzman* [1975] 47 Cal.App.3d at p. 387 [121 Cal.Rptr. 69].) Further, some of the factors highlighted by the instruction have no application to the present case. (Fn. omitted.) Although the trial court did not err in refusing to give the instruction as written, it should not have refused to tailor the instruction to the facts of this case. However, this error was not prejudicial since the trial court did read to the jury CALJIC No. 2.91 (fn. omitted), as modified at Nichols' request, and CALJIC No. 2.20 (fn. omitted). In the future, the trial courts should consider and give appropriate instructions involving reasonable doubt and eyewitness identification. (See *People* v. *Sears* [1970] 2 Cal.3d at p. 190 [84 Cal.Rptr. 711, 465 P.2d 847].)" (*Id.*, at pp. 159-160.)

■ As we hold in the companion case of *People* v. *Aho* (1984) *ante,* page 658 [199 Cal.Rptr. 671], Coates is correct that *Hall* mandates the giving of special instruction No. 1. Here, as in *Hall,* the trial court properly refused the proffered instruction as written, since it omitted at least one

important element of the model *Telfaire* instruction, the reference to the corporeal lineup,[2] although we have no way of knowing if that was the reason why it was refused. But the court, as *Hall* states, should have tailored the instruction by inserting the parts it believed should not have been omitted. (*People* v. *Hall, supra,* 28 Cal.3d at pp. 159-160.)

■ Whether the error is harmless must be determined by examining the facts of the case and the other instructions given. In *People* v. *West* (1983) 139 Cal.App.3d 606 [189 Cal.Rptr. 36], the refusal to give an instruction similar to Coates' special instruction was held to be reversible error. In *West* the defendant testified and had two other alibi witnesses. He also had a physical handicap which prevented him from doing the acts alleged, and a witness to the crime testified West was not the perpetrator. Lastly, CALJIC Nos. 2.91 and 2.20 were given. As stated in *West,* "Whether an error is harmless or not depends on the particular facts of each case and on the specific instruction refused." (*Id.,* at p. 610.)

Reviewing the facts before us and the other instructions given we cannot find the error to be harmless, as we have in *Aho.* Here, as in *West* and *Aho,* CALJIC Nos. 2.90 and 2.91[3] were given; but the prosecution's case was exceptionally weak. Coates had tattoos and scars not observed by the victim, and his voice did not impress her recollection. Her opportunity to view the robber's features was obscured by sunglasses and a hat, and she had little time to view what could be seen of his face. She also noted a significant number of physical differences during the lineup held at the jail. A search of Coates' home and vehicle turned up no corroborating evidence—no blue slacks, hat, sunglasses, vodka, Winstons or revolver. Also, a witness said Coates did not own or use any of these items, and she was with him when

---

[2]There is little basis for the claim the reference to the voice aspect of the lineup should have been given. Jeter's identification was not assisted by hearing Coates' voice, according to her testimony.

[3]CALJIC No. 2.90 reads: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

Former CALJIC No. 2.91 read: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

the robbery occurred. It is also significant that the jury sought a rereading of the circumstantial evidence and reasonable doubt instructions which were given; it is as though the jurors themselves were requesting a more detailed instruction on the subject of identification, the only issue in the case.

### III

■ As to special instruction No. 2, which warned the jury to draw no adverse inference from the police possession of Coates' photograph, we would not find the refusal to give that instruction reversible in this or most other cases. The matter was collateral at best, and in any event the jury was advised of a previous police contact by Darlene Deal, when she testified without objection that the last handgun Coates owned was confiscated by police several years ago.[4] However, on retrial, if no explanation is offered for Coates' picture in police files, the trial court should give the instruction.

The judgment is reversed.

Wallin, J., concurred.

**TROTTER, P. J.**—I respectfully dissent. I am not willing to accept the premise of the majority that a single witness identification absent a *Guzman-Telfaire* instruction is reversible error. Nor am I willing, since it is not our role, to reweigh the evidence; which must be done to achieve the result of my colleagues. Here instructions CALJIC Nos. 2.90 and 2.91 were given. While not so exhaustive or detailed as the *Telfaire* instruction they adequately informed the jury of defendant's presumption of innocence and the People's burden of proving the defendant's identity by eyewitness testimony.

Further, CALJIC No. 2.20 and 2.22[1] discussed what factors the jury should consider in evaluating the testimony of the victim/witness. The in-

---

[4]The source of the picture was explained at the motion for new trial. Coates had been arrested with a loaded rifle in his car near the time of a robbery in Huntington Beach in which the robber used a handgun and wore a white hat with blue band and sunglasses and otherwise matched Coates' description. The victim of that robbery said Coates was not the robber; but defense counsel chose not to call that person at trial because Coates' employer had misplaced his employment record for the day of that robbery, which also occurred in May 1982. Counsel may want to reconsider that decision on retrial.

[1]CALJIC No. 2.20 as read to the jury provides: "Every person who testifies under oath is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness. In determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following: the extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified; the ability of the witness to remember or to commu-

structions given clearly identified the main issue: the identity of the defendant. The victim/witness described the defendant in detail to the police; she identified him in two separate lineups and heard his voice. There was no suggestion the identification process was suggestive or in any way improper. The alibi testimony was equivocal at best and disclosed defendant spent the night within one block of the robbery scene on a Thursday close to the date of the crime. The jury heard the cross-examination by defendant's counsel and his argument as to the reliability of the identification.

Any error resulting from failure to give more detailed instructions on the issue of identification most certainly is harmless beyond a reasonable doubt. There was substantial evidence identifying the defendant and the jury was adequately instructed on the matter.

Respondent's petition for a hearing by the Supreme Court was denied April 25, 1984.

nicate any matter about which the witness has testified; the character and quality of that testimony; the demeanor and manner of the witness while testifying; the existence or nonexistence of a bias, interest, or other motive; evidence of the existence or nonexistence of any fact testified to by the witness; the attitude of the witness toward the action in which testimony has been given by the witness or toward the giving of testimony; a statement previously made by the witness that is consistent or inconsistent with the testimony of the witness."

CALJIC No. 2.22 provides: "You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force. This does not mean that you are at liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. It means that the final test is not in the relative number of witnesses, but in the relative convincing force of the evidence."