[Crim. No. 39845. Second Dist., Div. Two. Apr. 5, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH GLAUDE, Defendant and Appellant.

634

COUNSEL

M. Allen Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEACH, J.**—A jury found defendant guilty of murder in the first degree (Pen. Code, § 187), and found to be true the "special circumstance" allegation that the murder was committed during a robbery, within the meaning of Penal Code section 190.2, subdivision (a)(17). The jury also found defendant guilty of robbery (Pen. Code, § 211) and kidnaping (Pen. Code, § 207), and found to be true the allegations that as to all three offenses defendant had personally used a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, and that as to the robbery defendant had inflicted great bodily injury upon the victim, within the meaning of Penal Code sections 12022.7 and 1203.075. The trial court found that Penal Code section 190.5 precluded imposition of the death penalty as defendant was only 16 years old at the time he committed the crime. The court sentenced defendant to state prison for life without the possibility of parole.

Defendant appeals, claiming (1) error by the trial court in not excluding Julia Garcia's identification testimony as it was the product of a hypnosis session, (2) improper photographic identification, and (3) error by the trial court in refusing defendant's proffered instructions to the jury on identification, and (4) improper sentence of life without the possibility of parole. We affirm.

FACTS:

At 2 a.m. on February 15, 1980, Julia Garcia was working as a cook on a catering truck owned by the victim Larry Arnold. While the truck was parked at the Oscar Meyer plant in Vernon, Garcia saw defendant run towards the truck. The manner in which defendant ran towards the truck scared Garcia. Believing that she and the victim would be robbed, she called out to him, "Oh,

my God, Larry." The victim turned around. Garcia heard a popping sound and saw the victim fall. Blood was on the victim's face.

Garcia grabbed a pistol in a holster and, without removing the holster, tried to fire the gun at defendant. The gun did not go off. Defendant entered the truck, pointed a gun at Garcia, and ordered her to put the gun she was holding on the counter. Garcia did so.

Defendant sat down in the driver's seat and backed up the truck. Another man then entered the truck and started driving the truck while defendant kept his gun pointed at Garcia, who was lying on her right side in the back of the truck. Defendant asked Garcia if she knew whether the victim had a money belt. Garcia replied she did not know. Earlier she had observed money in the victim's wallet. The victim also carried a money changer on a belt around his waist, which held coins of various denominations. After they had driven for about an hour, Garcia saw papers from the victim's wallet hit the floor. The truck stopped and the two men got out.

Garcia got up, looked out of the window and, not seeing anyone, opened the door of the truck very slowly and peeked out. She got out, went around the truck, and ran to a house across the street to summon help. Shortly thereafter, the police arrived and Garcia related what had happened, giving a description of defendant.

An autopsy established that the victim had died from a gunshot wound in the mouth which caused a hemorrhage.

At her home, Garcia was shown photographs depicting young male blacks. She identified none. On a separate occasion thereafter Garcia was again shown a number of photographs. She kept staring at defendant's photograph. She was scared. She was afraid defendant would look for her and kill her. As she looked at the picture, Garcia said "Just something about this one's lips. His eyes." She left it at that.

A day or so later someone from the Sheriff's office came to Garcia's house to draw a picture of Arnold's killer based on Garcia's description of him. When the artist started writing down Garcia's responses, she became afraid and wanted to block it all out. After the drawing was completed, Garcia was asked whether it resembled the killer. Garcia replied, "Yes," even though she did not believe it was a good likeness, but she just wanted to be left alone.

Later, Garcia attended a line-up. At first she told Deputy Edward Huffman she would not attend one. She was afraid defendant would find her and kill her and her daughters. The deputy then told her she did not need to be afraid

because the individuals she would be viewing would be behind one-way glass and they could not see her. Garcia agreed to the line-up. Garcia immediately recognized defendant, not only from his features but his voice. She was so afraid of defendant, however, that when she filled out her identification card she stated she was unable to make any identification.[1]

Thereafter, in July 1980, an individual named Edwin Jordan was in custody for illegal possession of firearms and suspicion of burglary. The gun in Jordan's possession was a .357 caliber magnum revolver. Jordan testified he bought the gun for $25 on February 22, 1980, from defendant, whom he had known about five years. A week after the purchase defendant told Jordan he had obtained the gun in a robbery of a catering truck, and he described to Jordan in detail the circumstances of the robbery and the killing. Defendant told Jordan that while the catering truck was parked at the Oscar Meyer plant in Vernon defendant ran towards it, briefly struggled with the man in the truck, after which he shot the man in the head. A woman in the truck came out with a revolver but surrendered the gun to defendant, who then ordered her to lie down in the back of the truck. Defendant removed the man's wallet from his pocket and drove the truck halfway up the block, at which point defendant's companion Eric Oliver jumped in. They later parked the truck near Dominguez High School. Defendant also told Jordan that the man he killed had a money changer, that defendant wanted it but did not take it because it was lying in a lot of blood. Deputy Huffman later obtained the gun from the arresting police officers. The deputy testified that the gun was a double action pistol: one motion of pulling the trigger would both cock the weapon and fire it. When the trigger is pulled, the cylinder in the gun rotates. But if the cylinder is prevented from rotating, the pistol will not fire. For instance, it is common in a holster to have a strap around the handle or the hammer of the pistol to hold it in place. When the hammer cannot be retracted, the pistol will not fire.

DISCUSSION:

### 1. *Effect of Prior Hypnotism on Admissibility of Garcia's Testimony*

Several hours following the killing, Julia Garcia was hypnotized to enable her to recall details surrounding the killing and to provide a description of the killer. Defendant contends that because of Garcia's hypnotically refreshed recollection the trial court erred in admitting her identification testimony. (*People* v. *Shirley* (1982) 31 Cal.3d 18, 66-67 [181 Cal.Rptr. 243, 641 P.2d 775].)

*Shirley* holds that once a witness has been hypnotized, he or she is thereafter deemed incompetent to testify about any matter touched upon during hypnosis. However, as the court explains, the error in admitting testimony of a previously

---

[1] At the preliminary hearing Garcia identified defendant as the man who had killed Arnold. At the trial, too, Garcia was positive about her identification of defendant.

hypnotized witness is not necessarily reversible error. Its effect must be judged under the prejudicial error test adopted in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. Thus, the reviewing court must determine whether it is "reasonably probable that a result more favorable to the defendant would have occurred if the testimony of the previously hypnotized witness as to all matters relating to the events of the crime had not been admitted." (*People* v. *Shirley, supra,* 31 Cal.3d 18, 69-70.) In reversing defendant's conviction in *Shirley,* the court held the admission of the complaining witness' testimony prejudicial because it constituted virtually the sole incriminating evidence against defendant. (*Id.* at p. 70.)

■ Assuming that the rule of *Shirley* is applicable to this case, which was tried before the *Shirley* decision,[2] the rule of *Shirley* does not require reversal here. Although the nature and quality of the hypnotized witness' testimony in *Shirley* and that of the witness in the case at bench are factually distinguishable, we assume that the rule announced in *Shirley* renders Garcia's testimony at bench inadmissible. Our decision here does not rest on any factual differences or upon any interpretation of *Shirley* that would allow the testimony of a hypnotized witness. Rather, we rest our decision on our finding of no prejudice to defendant by the admission. Earlier in this opinion we set forth the testimony of Jordan. His testimony was unequivocal in its identification of defendant with the crime.

We are satisfied that based on the facts of this case it is not reasonably probable that a result more favorable to defendant would have occurred if Garcia's testimony which under the *Shirley* rule was tainted by pretrial hypnosis had not been admitted. (*People* v. *Shirley, supra,* 31 Cal.3d 18, 69-70; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

## 2. *Admissibility of In-court Identification*

Defendant claims the photographic identification procedure utilized in this case was impermissibly suggestive and therefore the trial court should have excluded Garcia's in-court identification of him. Particularly, defendant contends the photographic identification procedure was unfair because one of the two deputies present placed his hand over defendant's hair in the photograph, after which Garcia mentioned his eyes looked familiar.

■ A defendant has the burden of showing that the identification procedure he is challenging resulted in such unfairness that it infringed his right to due process. (*People* v. *Hunt* (1977) 19 Cal.3d 888, 893 [140 Cal.Rptr. 651, 568

---

[2]The effect of retroactivity of cases tried before the *Shirley* decision now pends before the California Supreme Court.

P.2d 376]; *People v. Caruso* (1968) 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336].)

Garcia testified that Deputy Huffman showed her various photographs depicting different men. Garcia looked at the photographs closely. Although she recognized defendant, she said nothing out of fear that he would look for her. As she stated, "I was afraid that this man was out on the street, was probably looking for me, and he would evidently find me and probably kill me, the same way he had Larry." All she said in regards to defendant's picture was, "The eyes and the mouth resemble him." She added she was not sure. While Garcia testified that at one point Deputy Huffman placed his hand over defendant's hair in the picture, it is not clear from her testimony whether he did this before or after she had made the remark about defendant's eyes and mouth. However, Deputy Huffman testified that when he handed Garcia the folder of photographs, she took them to her kitchen table to look at them under the light over the table. She then said that photograph number 4, which depicted defendant, showed eyes which resembled the killer's eyes. At that point, Deputy Huffman covered the upper portion of each of the photographs with one hand, asking her why she felt that number 4's eyes were different from the others. Deputy Huffman testified that Garcia did not elaborate, saying only, "They are the same," and adding that his mouth and chin were too thin. Deputy Huffman denied touching any of the photographs before Garcia said something about defendant's photograph. ▇ "A conviction based on eyewitness identification at trial after a pretrial display of photographs, including photographs of the defendant, 'will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (*People v. Hunt, supra,* at p. 894; *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].)

The record shows that Garcia's identification was not based on any suggestive procedure but on her independent recollection of the events. She herself testified that she immediately recognized defendant's photograph but refused to positively identify him out of fear that if she did so he would kill her. We are unable to discern any substantial likelihood of irreparable misidentification in the procedures utilized.

▇ Defendant's argument to the contrary notwithstanding, there is no right to counsel at a photographic identification procedure. (*People v. Rist* (1976) 16 Cal.3d 211, 216-217 [127 Cal.Rptr. 457, 545 P.2d 833].)

Defendant also complains of unfairness at the preliminary hearing where the deputy district attorney allegedly told Garcia prior to the proceedings where defendant would be seated. Garcia testified at trial that the deputy district at-

torney handling the preliminary hearing had told her in advance where defendant would be seated. The deputy district attorney in question testified that prior to the hearing she discussed the case with Garcia in a room across the hall from the courtroom. The deputy denied telling Garcia through which door defendant would enter and where he would be seated in the courtroom.

■ Uncertainties or discrepancies in witnesses' testimony raise only evidentiary issues which are for the jury to resolve. (*People* v. *Hunt, supra,* 19 Cal.3d 888, 894.) We are satisfied from the record before us that Garcia's in-court identification of defendant was not based on any prior knowledge as to where defendant would be seated but was instead based on her own independent recognition of defendant. As discussed fully in our summary of the facts, Garcia immediately recognized defendant from the photographs shown her and from the line-up she later attended.

### 3. *Jury Instructions on Identity*

Defendant contends the trial court erred in not giving the jury his proffered instructions concerning proof of identity beyond a reasonable doubt.

In *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 387 [121 Cal.Rptr. 69], the court held "a defendant is entitled to an instruction directing the jury's attention to evidence from the consideration of which reasonable doubt of defendant's guilt might be engendered." (See also *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].)

Following *Guzman,* a number of cases have held that as long as CALJIC Nos. 2.20 (relating to the credibility of witnesses) and 2.91 (concerning reasonable doubt) are given, they are sufficient to focus the jury's attention on the People's burden on the issue of identity. (*People* v. *Sequeria* (1981) 126 Cal.App.3d 1, 17-18 [179 Cal.Rptr. 249]; *People* v. *Lybrand* (1981) 115 Cal.App.3d 1, 13 [171 Cal.Rptr. 157] and cases cited therein.) In *Lybrand* the court noted that in *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826] the California Supreme Court "resurrected" *Guzman,* stating it was error to refuse to give an instruction requested by the defendant which deals with identification in the context of reasonable doubt. (*People* v. *Hall, supra,* at p. 159; *People* v. *Lybrand, supra,* 115 Cal.App.3d 1, 13.) The error was held to be nonprejudicial because the trial court did instruct the jury under CALJIC No. 2.91 and No. 2.20. ■ Here the trial court did give defendant's instruction (in essence CALJIC No. 2.91) that the People had to prove beyond a reasonable doubt that defendant was the perpetrator of the crime

charged.[3] In this regard, the case is distinguishable from *Guzman* where no instruction linking identification to the concept of reasonable doubt was given. We further note that the trial court also instructed the jury in the terms of CALJIC No. 2.20 relating to the credibility of witnesses and CALJIC No. 2.22 concerning the weighing of conflicting testimony. Thus, error, if any, in not giving defendant's proffered instructions in this instance was harmless. (*People v. Hall, supra,* at pp. 158-160; *People v. Lybrand, supra,* 115 Cal.App.3d 1, 13.)

### 4. *Sentencing*

Defendant contends his sentence of life without possibility of parole on the murder conviction is improper because he was a minor at the time the crime was committed.

The murder was committed in the perpetration of a robbery, and therefore was murder of the first degree. (Pen. Code, § 189.) A first degree murder conviction carries either a sentence of death or life imprisonment without the possibility of parole if one or more of specified special circumstances has been charged and found to be true. (Pen. Code, § 190.2.) Murder committed while perpetrating a robbery, as was the case here, is such a special circumstance. (Pen. Code, § 190.2, subd. (a)(17)(i).) Because defendant was a minor at the time of the offense, no death penalty could be imposed, as the trial court properly found. (Pen. Code, § 190.5.)

The question is whether the trial court acted properly in imposing a life sentence without possibility of parole. Recently, the California Supreme Court held that the death penalty law, as amended by the initiative adopted at the 1978 General Election, did not authorize imposing a life sentence without possibility of parole in the case of an individual who was less than 18 years of age at the time of the commission of the crime. (*People v. Spears* (1983) 33 Cal.3d 279,

---

[3]CALJIC 2.91 reads: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

The instruction requested by defendant and given by the trial court in this case reads: "You are instructed that the identity of the defendant as the person who committed the crime is an element of every crime. Therefore, the burden is on the state to prove beyond a reasonable doubt not only that the crime alleged was committed, but also that the defendant was the one who committed it. [¶] In this regard, you are instructed that it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, then you should find the defendant not guilty of the offense."

283 [188 Cal.Rptr. 454, 655 P.2d 1289].) In this case, therefore, defendant's sentence of life without possibility of parole is improper, and only a prison term of 25 years to life can be imposed. (*Ibid.*; Pen. Code, § 190.[4])

The People argue, without any argument to the contrary by defendant in his reply brief, that as to count 1 (murder) the trial court should have imposed the Penal Code section 12022.5 (use of firearm) enhancement, which allegation the jury found to be true. ■ Penal Code section 12022.5 may be invoked only once when "all the charged offenses are incident to one objective and effectively comprise an indivisible transaction. . . ." (*In re Culbreth* (1976) 17 Cal.3d 330, 333 [130 Cal.Rptr. 719, 551 P.2d 23]; *People* v. *Cardenas* (1982) 31 Cal.3d 897, 913 [184 Cal.Rptr. 165, 647 P.2d 569].) Here the killing and robbery of Lawrence Arnold clearly constituted an indivisible transaction. Defendant's primary objective was robbery, and the killing was incidental to it. Under those circumstances, the firearm use enhancement could be applied only to one sentence. (*People* v. *Cardenas, supra,* at pp. 913-914.) This is what the trial court did here. While the court did not impose the enhancement with respect to the murder, it did so with regard to the robbery.

■ The People further contend that the trial court erred in staying the determinate sentences on counts 2 (robbery) and 3 (kidnaping) pending completion of the life sentence on count 1 (murder). In support, the People cite *People* v. *Grimble* (1981) 116 Cal.App.3d 678 [172 Cal.Rptr. 362]. In his reply brief, defendant has offered no argument in opposition on this issue. Under Penal Code section 669, a life sentence, whether with or without the possibility of parole, may be ordered to run consecutive to any other prison term for any felony, in which case the determinate terms must be served first. (*Id.* at pp. 684-685.) This was not done here.

As we discussed earlier, the robbery and murder constituted one indivisible course of conduct. Penal Code section 654 provides in relevant part that an "act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one. . . ." Thus, while section 654 does not prohibit multiple convictions, it prohibits multiple punishments for a single act or indivisible course of conduct. (*People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) In that situation, an acceptable procedure is to sentence the defendant on each count and to stay execution of sentence on those convictions to which Penal Code section 654 applies. (*People* v. *Wein* (1977) 69 Cal.App.3d 79, 94 [137 Cal.Rptr. 814].) With respect to the robbery, therefore, a stay of execution of sentence was proper. (*Ibid.*) However, as

---

[4]Penal Code section 190 provides that a person found guilty of first degree murder "shall suffer death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life."

to the kidnaping, it was improper to stay execution of sentence inasmuch as the kidnaping was punished by a determinate sentence which, as we explain, must be served first. Notwithstanding the fact that a defendant "entertained but a single principal objective during an indivisible course of conduct, he may nevertheless be punished for multiple convictions if during the course of that conduct he committed crimes of violence against different victims." (*People* v. *Miller, supra,* 18 Cal.3d 873, 885.) The kidnaping of Julia Garcia at gunpoint was an act of violence involving a different victim, thus precluding the application of Penal Code section 654.

We noted earlier that under Penal Code section 669 determinate sentences must be served prior to a life sentence. The effect this will have on the computation of the sentences was explained by the court in *People* v. *Day* (1981) 117 Cal.App.3d 932, 936-937 [173 Cal.Rptr. 9] as follows: "The Legislature has clearly distinguished indeterminate life sentences and determinate sentences under Penal Code sections 1170 and 1170.1 and provides that the determinate sentence be served first under Penal Code section 669. However, there is no provision designating one term as principal and the other a subordinate term. The legislative intent to treat the term as independent is clear. Penal Code section 1168, subdivision (b), provides that the court imposing the sentence shall not fix the term or duration for a period of imprisonment. Penal Code section 669 distinguishes life terms from any determinate term of imprisonment imposed pursuant to sections 1170 and 1170.1." (See also CJER Journal, California Judges Benchguide on Felony Sentencing, Special Issue No. 2 (June 1982), § 56, pp. 245-59−245-60.)

The judgment of conviction is affirmed. The matter is remanded to the trial court for the purpose of resentencing appellant in accordance with observations expressed herein. Because the trial court appears to have imposed sentence under a superseded version of Penal Code section 669, upon such resentencing the trial court is free to impose the enhancement provided for in Penal Code section 12022.5 as to the murder count rather than as to the stayed robbery count.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied May 3, 1983, and the judgment was modified to read as printed above.