[No. E022259. Fourth Dist., Div. Two. June 28, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD LEWIS CENTERS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney

General, Esteban Hernandez and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—Victim Daniel Raines owed defendant Donald Lewis Centers (defendant) about $200 for an "eight-ball" of methamphetamine. Defendant barged into the house where Raines was hiding out from him and kidnapped Raines at gunpoint. He drove Raines around town, from pay phone to pay phone, while Raines tried to arrange payment of $200 in ransom. Defendant kept the loaded gun pointed at Raines most of this time and threatened to shoot him if he could not get the money, if he did anything "funny," or if the police intervened. Defendant was captured, and Raines was freed, when the police raided the ransom "drop."

In the published portion of this opinion, we will hold there was sufficient evidence that defendant intentionally confined the victim in a manner which exposed the victim to a substantial likelihood of death, so as to support a sentence of life without the possibility of parole. (Pen. Code, § 209, subd. (a).)

We will also consider the "multiple victim" exception to Penal Code section 654. This applies where the defendant has committed violent crimes against multiple victims. We will hold that burglary is a violent crime for purposes of the "multiple victim" exception when the jury finds that, in the commission of the burglary, the defendant personally used a firearm. We will also hold that the trial court may determine the identity of the victim (or victims) of a violent crime for this purpose even though no victim was named in the information or by the jury.

In the nonpublished portion of this opinion, we find no reversible error. Accordingly, we will affirm.

### I

#### FACTUAL BACKGROUND

Defendant supplied victim Daniel Raines with methamphetamine for re-sale. Defendant would "front" Raines an eight-ball (an eighth of an ounce of methamphetamine); Raines would sell it, use the proceeds to repay defendant, and keep any profit.

In late December 1996, Raines made the mistake of keeping and using one of defendant's eight-balls. As a result, he was unable to repay the $200, so

he owed defendant for it. When defendant angrily confronted him, Raines told defendant he was going to a friend's house to get the money. But Raines did not come back; instead, he started hiding out from defendant by staying with various friends, each for only a few days.

On January 15, 1997, Raines was staying with a friend in Winchester. Jennifer Grundman, who lived there, and a man named Rick were also present. About 11:30 a.m., defendant opened the front door and came in. Defendant's girlfriend, Michelle Estrada, came in behind him. Defendant was holding a revolver. He announced, "I'm going to take Danny." "He owes me money." Defendant then pointed the gun "in [Raines's] face" and said: "You're coming with me. You're going to pay your debt." Rick said, "He's not going with you." Defendant cocked his gun, pointed it at Rick, and asked, "You're willing to take a bullet for your friend?"

Defendant took Raines by the one arm; Estrada took him by the other arm. Defendant was still pointing the gun at Raines's stomach. They walked him out to defendant's car and told him to get in. Defendant's two young daughters were in the backseat. Defendant said: "You're going to get my money, mother fucker. You're going to get my money. I want my money today. You ain't leaving my sight until I get my money."

Shortly after defendant began driving, he unloaded his gun and gave it to Estrada. According to Estrada, she put it in the trunk; she testified that, about two hours later, when defendant dropped her off, it was still there.

According to Raines, however, he was still afraid because Estrada, who was sitting right behind him, had the gun. About 15 minutes later, defendant reloaded the gun. While he drove, he held the gun under his right leg, pointed at Raines. He said, "Don't do anything funny, . . . because the gun is pointed straight at you . . . ." "I could shoot it at any time." Later, defendant took the gun out from under his leg and held it on his lap. He threatened to shoot Raines if he did not get his money. He also threatened several times to shoot Raines if the police got involved.

· Defendant drove to a gas station in Hemet, where Raines made several calls from a pay phone in an effort to raise the money. Estrada went with him while he called. Eventually, an acquaintance named Kim Yoakum told Raines she would try to get the money for him. Defendant drove Raines to another gas station, where Raines called Yoakum again. Once again, Estrada stayed with him while he called. Sometime after this, defendant dropped Estrada and their children off at a friend's house.

Yoakum tried to raise the money, but failed. Nevertheless, she agreed to meet defendant at an AM/PM minimarket and to give him the money.

Defendant told Yoakum not to notify the police. Raines, too, told her not to get the police involved. Yoakum, however, called the police immediately.

After defendant and Raines arrived at the AM/PM, defendant noticed an unmarked police car. He said, "If it's a set up, I'll shoot you." As defendant was driving away, the police car pulled in front of him, blocking his path. Defendant maneuvered backward, then forward again, but more police cars boxed him in. Meanwhile, Raines jumped out of the moving car. A police officer pulled defendant out of the car and arrested him.

Inside the car, on the floorboard on the driver's side, the police found a fully loaded .357-magnum revolver. Estrada identified it as defendant's. They also found 4.9 grams of methamphetamine in the trunk.

## II

### PROCEDURAL BACKGROUND

A jury found defendant guilty of kidnapping for ransom (Pen. Code, § 209, subd. (a)), first degree burglary (Pen. Code, §§ 459, 460, subd. (a)), possession of a firearm by a convicted felon (Pen. Code, § 12021, subd. (a)(1)), transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), possession of methamphetamine while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a)), and assault with a firearm (Pen. Code, § 245, subd. (a)(2)).

The jury also found that, in the commission of the kidnapping, defendant intentionally confined the victim in a manner which either caused him to suffer bodily harm or exposed him to a substantial likelihood of death. (Pen. Code, § 209, subd. (a).) It further found that, in the commission of the kidnapping, the burglary, and the assault, defendant personally used a firearm. (Pen. Code, § 12022.5, subd. (a).) In a bifurcated proceeding, the trial court found that defendant had served five prior prison terms (Pen. Code, § 667.5, subd. (b)).

The trial court dismissed the convictions for possession of methamphetamine while armed and for assault with a firearm, all the personal firearm use allegations and all but two of the prior prison term allegations. (Pen. Code, § 1385, subd. (a).)[1] As a result, defendant was sentenced to an indeterminate term of life without the possibility of parole on the kidnapping for ransom, plus a total determinate term of nine years and eight months.

---

[1]Apparently the trial court felt Penal Code section 654 applied (or might apply) to these charges; however, rather than stay execution of the sentences on them (see generally, *In re*

## III

## THE SUFFICIENCY OF THE EVIDENCE OF A SUBSTANTIAL LIKELIHOOD OF DEATH

■ Defendant contends there was insufficient evidence he intentionally confined Raines in a manner which exposed Raines to a substantial likelihood of death.

■ The interpretation of the applicable statute is a question of law. (*People* v. *Taylor* (1992) 6 Cal.App.4th 1084, 1091 [8 Cal.Rptr.2d 439].) ■ The determination of the historical facts is committed to the jury. We " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People* v. *Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119], cert. den. (1996) 516 U.S. 1121 [116 S.Ct. 932, 133 L.Ed.2d 859].) Whether the facts (when so viewed) meet the statutory standard (when so construed) is a question of law. (See *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 570 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

■ Penal Code section 209, subdivision (a), defines the crime of kidnapping for ransom, reward, or extortion. It provides that, if "any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes that person to a substantial likelihood of death," the penalty is life in prison without the possibility of parole. Otherwise, the penalty is life in prison *with* the possibility of parole. (*Ibid.*) Immediately prior to 1982, the penalty of life without parole applied only if the victim "suffer[ed] death or bodily harm." (Former Pen. Code, § 209; Stats. 1977, ch. 316, § 15, p. 1262.) In 1982, the statute was amended to extend the penalty of life without parole to cases in which the victim "is intentionally confined in a manner which exposes such person to a substantial likelihood of death . . . ." (Stats. 1982, ch. 4, § 1, pp. 4-5.)

The People have never claimed Raines suffered bodily harm. There was evidence that, when Raines first got into the car, defendant hit him in the mouth with the back of his hand. This caused Raines "a little bit" of pain,

---

*Wright* (1967) 65 Cal.2d 650, 656 [56 Cal.Rptr. 110, 422 P.2d 998]), it thought the "safest way" was to dismiss them.

but no "bruises or anything like that." Defendant also hit Raines in the chest with his elbow. In addition, when Raines jumped out of defendant's car, the door hit him, and he got "scraped up a little bit." ■ These would appear to be the sort of "trivial injur[ies]" that are insufficient to constitute bodily harm within the meaning of the statute. (*People* v. *Jackson* (1955) 44 Cal.2d 511, 517 [282 P.2d 898] [fact that victim's wrists were bound so as to cause pain and impair circulation was insufficient evidence of "bodily harm"]; see also *People* v. *Gilbert* (1965) 63 Cal.2d 690, 711 [47 Cal.Rptr. 909, 408 P.2d 365] [fact that victim fell on sidewalk, absent evidence of any resulting injury, was insufficient evidence of "bodily harm"], revd. on other grounds (1967) 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178]; cf. *People* v. *Dacy* (1970) 5 Cal.App.3d 216, 220 [85 Cal.Rptr. 57] [four-inch cut requiring more than twenty stitches, plus smaller cuts, bruises, and "superficial abrasions," constituted "bodily harm"].) ■ In closing argument, the prosecutor elected to rely on a substantial likelihood of death; he did not argue Raines suffered bodily harm. We therefore limit our consideration to whether the jury could find defendant intentionally confined Raines in a manner which exposed him to a substantial likelihood of death.

The first case to construe the "substantial likelihood of death" provision was *People* v. *Serrano* (1992) 11 Cal.App.4th 1672 [15 Cal.Rptr.2d 305]. There, the defendant and his accomplices kidnapped the victim at gunpoint. (*Id.*, at p. 1674.) When the police located their hideout, they "used [the victim] as a shield, made it to a car, and drove off, leading the police on a seventy mile-per-hour chase on surface streets during which the culprits ran three red lights." (*Id.*, at p. 1675.) On appeal, the defendant did not raise, and the appellate court therefore did not discuss, the sufficiency of the evidence to show a substantial likelihood of death. ■ The court did hold, however, the "substantial likelihood of death" provision was not unconstitutionally vague: "We find nothing indicating that the Legislature intended the amendment to be read in any but its plain ordinary meaning." (*Id.*, at pp. 1676-1677.) "The Legislature . . . plainly meant to enhance punishment for a kidnapper who intentionally increases, by a certain degree, the risk of death otherwise inherent in kidnapping. [Citation.]" (*Id.*, at p. 1676.)

■ We have found only one case dealing with the sufficiency of the evidence of a substantial likelihood of death. In *People* v. *Chacon* (1995) 37 Cal.App.4th 52 [43 Cal.Rptr.2d 434], the defendants tried to escape from a Youth Authority facility by taking the librarian hostage. They held her at the point of a "shank," or homemade knife; they threatened to kill her with it unless they were given a truck in which to make their getaway. Once they had obtained the truck, they took the librarian with them and threatened to kill her if anyone interfered. After an officer sprayed Mace into the truck, it crashed into a tree. (*Id.*, at pp. 58-59.)

The appellate court held there was sufficient evidence that the defendants had intentionally confined the victim in a manner which exposed her to a substantial likelihood of death. "Before the truck was delivered, appellants choked [the victim] unconscious, stabbed her in the stomach, and severely bruised and sprained her right arm. The method of confinement and appellants' use of [the victim] as a hostage exposed her to a substantial risk of death. [¶] The trial court also found that the escape in the truck posed a substantial risk of death because it could have led to a high speed pursuit. This was not impermissible speculation. The Legislature's choice of the word 'likelihood' allows and requires the trier of fact to draw reasonable inferences in determining whether the victim was exposed to a substantial likelihood of death." (*People* v. *Chacon, supra,* 37 Cal.App.4th at p. 61.) The court also observed: "Intentional movement of the victim may create a substantial risk of death. [Citations.] [¶] Here, after appellants dragged [the victim] to the truck, and sped away from the library, the truck ran into a tree. The force of the impact broke the windshield, jammed the doors shut, and collapsed the steering wheel. The trial court factually found that the escape with [the victim] created a 'substantial risk of her death.' Substantial evidence supports this factual determination. [Citation.]" (*Id.,* at pp. 61-62.)

The "substantial likelihood of death" provision was added in response to *People* v. *Schoenfeld* (1980) 111 Cal.App.3d 671 [168 Cal.Rptr. 762]. (*People* v. *Chacon, supra,* 37 Cal.App.4th at p. 59, fn. 3; *People* v. *Serrano, supra,* 11 Cal.App.4th at p. 1676; *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1227, fn. 12 [277 Cal.Rptr. 382]; *Review of Selected 1982 California Legislation* (1983) 14 Pacific L.J. 357, 601-602.) *Schoenfeld* involved the notorious Chowchilla kidnapping; it held the victims' emotional distress, which led them to suffer nosebleeds, stomachaches, and fainting, did not constitute "bodily injury." (*People* v. *Schoenfeld, supra,* 111 Cal.App.3d at pp. 687-688.) The Legislature evidently intended to permit the imposition of life without the possibility of parole in any future case similar to *Schoenfeld.* Thus, as defendant concedes, "the *Schoenfeld* case provides some insight into the sort of circumstances to which the amendment applies."

The *Schoenfeld* defendants hijacked a school bus at gunpoint. (*People* v. *Schoenfeld, supra,* 111 Cal.App.3d at pp. 676-677.) They transported the children in overcrowded vans, without food, water, or toilets, for nearly 12 hours. They then imprisoned them in a "previously buried furniture van." (*Id.,* at pp. 677-678.) The buried van afforded about six and a half square feet of floor space per person. (*Id.,* at p. 678.) It was supplied with plenty of water and a little food. (*Id.,* at p. 678 and fn. 8.) "Crude holes had been cut in the fender wells of the van to serve as primitive toilets." (*Id.,* at p. 678.) The defendants had installed a ventilation system and had tested it to make

sure it would work for at least 48 hours. (*Id.*, at p. 678 and fn. 9.) Nevertheless, the van soon became stuffy and malodorous. (*Id.*, at p. 678.) If their ransom demand were not met, or if any of the children became ill, the defendants planned to halt the kidnapping and release the victims. (*Id.*, at p. 676, fn. 4.) After the victims were in the van for about 16 hours (*id.*, at p. 676), however, they managed to reopen the sealed entrance hole. All the victims escaped unharmed. (*Id.*, at p. 679.)

Here, the jury could reasonably find defendant intentionally confined Raines in a manner which exposed him to a substantial likelihood of death.[2] Defendant kept a fully loaded gun pointed at Raines, first in the house, then on the walk to the car. While driving around, defendant continued to point the gun at Raines. Defendant threatened to shoot Raines if he could not come up with the money, if he did anything "funny," or if the police got involved. Defendant argues that his ransom demand was small and Raines admitted owing the money. In the end, however, Raines *was* unable to come up with the ransom. Moreover, the police *did* become involved. Based on these facts, the jury was entitled to find Raines was exposed to a substantial likelihood of death.

Defendant understandably focuses on the fact that, for some period of time, the gun was unloaded and out of his hands. According to Raines, however, the gun was still in the hands of Estrada, defendant's accomplice, and she was sitting right behind him. Also, according to Raines, defendant took back the gun and reloaded it 15 minutes later. This brief lessening of the immediate danger is insufficient to defeat the jury's finding. Defendant also argues that he committed the kidnapping in front of witnesses; hence, he was not motivated to kill Raines to avoid identification. He also notes that he brought his family along. The weight to be given these matters was for the jury to decide. Even assuming the jury could have found defendant would not have killed Raines, it was not compelled to do so. The jury's implied finding to the contrary was supported by substantial evidence.

Raines was not in as much danger as the victim in *Chacon*, who was stabbed in the stomach, choked into unconsciousness, and driven into a tree. However, as the *Chacon* court held, the jury was entitled to consider various

---

[2]The statute turns on the manner in which the defendant "confines" the victim. It could be argued a substantial risk of danger during the original abduction, before Raines was fully "confined" in defendant's car, would fail to satisfy the statute. But even if so, defendant's conduct during this earlier period is some evidence of a substantial risk of danger at a later period. For example, defendant stopped Rick from interfering by pointing the gun at him and threatening to shoot him. This is additional evidence that, when defendant pointed the gun at Raines and threatened to shoot Raines, Raines was exposed to a substantial likelihood of death.

possibilities even though they did not come to pass, including the possibility that defendant would shoot Raines because he could not come up with the money or because the police intervened. Certainly it would seem Raines was in more danger than the victims in *Schoenfeld*, who, though buried underground, were supplied with food, water, and a working ventilation system, and who were to be released if they fell ill.

Defendant therefore argues that, as a matter of law, a "garden-variety" kidnapping at gunpoint should not be sufficient to support a finding of a substantial likelihood of death. He argues that, if the same penalty applies to a kidnapping at gunpoint, such as this one, as applies to a kidnapping in which the victim suffers death or bodily harm, a kidnapper will have little incentive to refrain from harming or killing the victim. We recognize that in discussing a pre-1982 version of the aggravated kidnapping statute, the Supreme Court declared that one of the rationales for an increased penalty when the victim "suffers death or bodily harm" was deterrence: " '[K]idnappers would be less likely to inflict violence upon their victims if they knew that such abstention would save them from the death penalty.' " (*People v. Jackson, supra*, 44 Cal.2d at p. 516, quoting *Robinson v. United States* (1945) 324 U.S. 282, 284 [65 S.Ct. 666, 667-668, 89 L.Ed. 944].) This reasoning, however, applies with less force to the "substantial likelihood of death" version of the statute. The statute is still meant to deter, but its deterrent aim has been lowered. By extending the increased penalty to cases in which the kidnapper has exposed the victim to a substantial likelihood of death, the Legislature's purpose necessarily shifted from deterring actual injury to deterring risk-creating behavior. Accordingly, any reduced disincentive effect follows from the Legislature's deliberate amendment of the statute, not from our holding carrying out that amendment.

We also note that a kidnapper still has ample incentive to avoid harming or killing the victim. If the victim dies during the kidnapping, the kidnapper ordinarily will be guilty of first degree felony murder (Pen. Code, § 189) and subject to the death penalty. (Pen. Code, § 190.2, subd. (a)(17)(B).) If the victim suffers serious harm, the kidnapper may be guilty of an additional offense, such as assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), and may be subject to an enhancement for the personal infliction of great bodily injury. (Pen. Code, § 12022.7, subd. (a).)

Defendant also argues the more severe penalty was not intended to apply to an "ordinary" kidnapping such as this and should be reserved for more egregious kidnappings. He relies on *People v. Jackson, supra*, 44 Cal.2d 511 and *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d

225, 43 A.L.R.3d 677]. As we noted earlier, *Jackson* held a "trivial injury" is insufficient to constitute bodily harm within the meaning of Penal Code section 209. (*People* v. *Jackson, supra,* 44 Cal.2d at p. 517.) There, the only evidence of bodily harm was that the victim's wrists had been bound with chains "so as to 'cut in' and impair to some extent the circulation of blood. There was no breaking of the skin, but 'a few little marks' similar to those which would be made by the band of a wristwatch." (*Id.,* at pp. 516-517.) The Supreme Court held this did not support a finding that the victim had suffered bodily harm "of the nature contemplated by the Legislature in providing the more serious penalty for a kidnaping." (*Id.,* at p. 517.) "If the more serious penalty may be imposed when the only injury is of a nature similar to that shown by the present record, which concededly is almost necessarily an incident to every forcible kidnaping, neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved." (*Ibid.*)

In *Daniels*, the Supreme Court held that movements of a robbery victim which "are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself" fail to satisfy the asportation element of kidnapping for robbery. (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1139.) It reasoned that, otherwise, almost every robbery, just so long as it involved the slightest movement of the victim, could be prosecuted as an aggravated kidnapping. (*Id.,* at pp. 1130-1132.) It also noted a concern that kidnapping for robbery, which carried a penalty (at that time) of death or life imprisonment, ought to require more egregious conduct than robbery, which did not. (*Id.,* at p. 1138.)

The *Daniels* court discussed and relied on *Jackson*: "Just as we recognized in *Jackson* that some minor injuries are necessarily incidental to the crime of forcible kidnaping, so we now recognize that some brief movements are necessarily incidental to the crime of armed robbery. . . . And just as we concluded in *Jackson* that such incidental injuries are 'not of the nature contemplated by the Legislature' in prescribing the bodily harm element of aggravated kidnaping, so we now conclude that such incidental movements are not of the scope intended by the Legislature in prescribing the asportation element of the same crime." (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1134, fn. omitted.)

We do not believe *Jackson* and *Daniels* support defendant's contention, for two reasons. First, the use of a gun to create a substantial likelihood of death is by no means "an incident to every forcible kidnaping." We are

willing to assume many kidnappings for ransom—or even most—involve facts similar to those here. Nevertheless, it is entirely possible to commit kidnapping for ransom without using a gun to create a substantial likelihood of death. First, one need not use a gun at all. The kidnapper (or kidnappers) may simply overpower the victim. This is particularly true in the prototypical kidnapping for ransom, in which the victim is a child. Second, even if one uses a gun, one need not create a substantial likelihood of death. Here, for example, defendant could have committed the kidnapping without creating a substantial likelihood of death simply by using an unloaded gun.

Second, in *Daniels*, the distinction in penalty was between kidnapping for robbery, which was punishable by death or life imprisonment, and robbery, which was punishable by as little as one year in prison. (Former Pen. Code, § 213; Stats. 1923, ch. 128, § 1, p. 271 [in effect through Dec. 31, 1967]; Stats. 1967, ch. 149, § 1, p. 1216 [in effect from Jan. 1, 1968].) Even in *Jackson*, the distinction was between a potential death penalty and life with the possibility of parole. (*People* v. *Jackson*, *supra*, 44 Cal.2d at p. 515, quoting former Pen. Code, § 209; Stats. 1933, ch. 1025, § 1, p. 2617.) We share the concern that so drastic a difference in penalty should reflect a significant difference in culpability. Here, however, the distinction in penalty is between life without the possibility of parole and life with the possibility of parole. We recognize that a defendant sentenced to life with the possibility of parole may be paroled after as little as seven years. (Pen. Code, § 3046.) Nevertheless, we believe this distinction in penalty is not disproportionate to the distinction in culpability between one kidnapper who threatens the victim with a gun in a manner which exposes the victim to a substantial likelihood of death and another who does not. Even assuming that, under our holding, the majority of kidnappings for ransom do expose the victim to a substantial likelihood of death, we believe this is both intended by the Legislature and required by the language of Penal Code section 209, subdivision (a).

At the same time, we are not holding the use of a loaded gun, standing alone, necessarily exposes the victim to a substantial likelihood of death as a matter of law. Inasmuch as there was additional evidence here of a substantial likelihood of death, we are not called upon to address this question, and we express no opinion on it. We merely hold there is substantial evidence to support the jury's finding that defendant intentionally confined Raines in a manner which exposed Raines to a substantial likelihood of death.

## IV

### CRUEL AND UNUSUAL PUNISHMENT*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## V

### THE APPLICATION OF PENAL CODE SECTION 654 TO THE BURGLARY AND THE KIDNAPPING

Defendant contends the trial court violated Penal Code section 654 by imposing separate and unstayed sentences for both the burglary and the kidnapping.

"Section 654 provides that even though an act violates more than one statute and thus constitutes more than one crime, a defendant may not be punished multiple times for that single act. [Citations.] The 'act' which invokes section 654 may be a continuous ' "course of conduct" . . . comprising an indivisible transaction . . . .' [Citation.] 'The divisibility of a course of conduct depends upon the intent and objective of the defendant. . . . [I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People* v. *Akins* (1997) 56 Cal.App.4th 331, 338-339 [65 Cal.Rptr.2d 338], quoting *People* v. *Liu* (1996) 46 Cal.App.4th 1119, 1135 [54 Cal.Rptr.2d 578].)

Burglary consists of entry into a house or other specified structure with the intent to commit a felony. (Pen. Code, § 459.) Thus, ordinarily, if the defendant commits both burglary and the underlying intended felony, Penal Code section 654 will permit punishment for one or the other but not for both. (*People* v. *Price* (1991) 1 Cal.4th 324, 492 [3 Cal.Rptr.2d 106, 821 P.2d 610] [burglary and intended murder], cert. den. (1992) 506 U.S. 851 [113 S.Ct. 152, 121 L.Ed.2d 102]; *People* v. *James* (1977) 19 Cal.3d 99, 119-120 [137 Cal.Rptr. 447, 561 P.2d 1135] [burglary and intended robbery]; *In re McGrew* (1967) 66 Cal.2d 685, 688 [58 Cal.Rptr. 561, 427 P.2d 161] [burglary and intended sexual offenses]; *People* v. *Cline* (1998) 60 Cal.App.4th 1327, 1336 [71 Cal.Rptr.2d 41] [burglary and intended theft]; *People* v. *Curtin* (1994) 22 Cal.App.4th 528, 532 [27 Cal.Rptr.2d 369]

---

*See footnote, *ante*, page 84.

[burglary and intended forgery]; *People* v. *Radil* (1977) 76 Cal.App.3d 702, 713 [142 Cal.Rptr. 233] [burglary and intended assault]; *People* v. *Williams* (1971) 19 Cal.App.3d 339, 345 [96 Cal.Rptr. 848] [burglary and intended arson].)

"However, there is a 'multiple victim' exception to section 654. Under this exception, 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' [Citations.] The reason for the multiple victim exception is that 'when a defendant " 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654." ' [Citation.]" (*People* v. *Garcia* (1995) 32 Cal.App.4th 1756, 1781 [39 Cal.Rptr.2d 73], quoting *People* v. *Ramos* (1982) 30 Cal.3d 553, 587 [180 Cal.Rptr. 266, 639 P.2d 908] and *People* v. *McFarland* (1989) 47 Cal.3d 798, 803 [254 Cal.Rptr. 331, 765 P.2d 493], respectively.)

Burglary, standing alone, is not a violent crime for purposes of the multiple victim exception. (*People* v. *Guzman* (1996) 45 Cal.App.4th 1023, 1028 [53 Cal.Rptr.2d 67]; *In re Asean D.* (1993) 14 Cal.App.4th 467, 475, fn. 10 [17 Cal.Rptr.2d 572].) However, it may be treated as such when there is a finding that the defendant inflicted great bodily injury in the commission of the burglary. (*People* v. *Miller* (1977) 18 Cal.3d 873, 886 [135 Cal.Rptr. 654, 558 P.2d 552] [great bodily injury allegation under former Pen. Code, § 461 (Stats. 1967, ch. 150, § 1, p. 1216)]; *People* v. *Robinson* (1988) 198 Cal.App.3d 674, 679-681 [244 Cal.Rptr. 17] [great bodily injury enhancement allegation under Pen. Code, § 12022.7].) We believe it also may be treated as such when there is a finding that the defendant personally used a firearm in the commission of the burglary. (Pen. Code, § 12022.5, subd. (a).) For example, robbery is deemed a violent crime (*People* v. *Champion* (1995) 9 Cal.4th 879, 935 [39 Cal.Rptr.2d 547, 891 P.2d 93], cert. den. (1996) 516 U.S. 1049 [116 S.Ct. 714, 133 L.Ed.2d 668]), even though it may be committed by fear as well as actual force. (Pen. Code, § 211.) ▮ The "use" of a firearm has been defined as either "conduct which actually produces harm . . . [or] conduct which produces a fear of harm or force by means or display of a firearm . . . ." (*People* v. *Masbruch* (1996) 13 Cal.4th 1001, 1007 [55 Cal.Rptr.2d 760, 920 P.2d 705], italics omitted, quoting *People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024].) ▮ By analogy, any crime involving the "use" of a firearm should be deemed violent for this purpose.

▮ Both kidnapping for robbery (Pen. Code, § 209, subd. (b)) and simple kidnapping (Pen. Code, § 207, subd. (a)) require force or fear.

(*People* v. *Davis*, *supra*, 10 Cal.4th at p. 517, fn. 13 [simple kidnapping]; see People v. *Daniels*, *supra*, 71 Cal.2d at p. 1126 [definition of kidnapping for robbery incorporates elements of simple kidnapping].) Thus, both kidnapping for robbery and simple kidnapping have been held to be violent crimes for purposes of the multiple victim exception. (*In re Ford* (1967) 66 Cal.2d 183, 184 [57 Cal.Rptr. 129, 424 P.2d 681] [kidnapping for robbery]; *In re Wright*, *supra*, 65 Cal.2d at p. 656 [kidnapping for robbery]; *People* v. *Guevara* (1979) 88 Cal.App.3d 86, 90 [151 Cal.Rptr. 511] [simple kidnapping].)

Kidnapping for ransom, however, can be committed by "seiz[ing], confin[ing], inveigl[ing], entic[ing], decoy[ing], abduct[ing], [or] conceal-[ing]" the victim. (Pen. Code, § 209, subd. (a).) Thus, it would seem it can be committed without force or fear. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 621 [205 Cal.Rptr. 775, 685 P.2d 1126] [dictum].) But even assuming, without deciding, kidnapping for ransom is not a violent crime in itself, here the jury also found that, in the commission of the kidnapping, defendant personally used a firearm. Hence, the kidnapping, too, was a violent crime for purposes of the multiple victim exception. (See *People* v. *Glaude* (1983) 141 Cal.App.3d 633, 644 [190 Cal.Rptr. 479] [defendant found guilty of murder, plus simple kidnapping involving personal firearm use; "The kidnaping . . . at gunpoint was an act of violence involving a different victim, thus precluding the application of Penal Code section 654."].)

Defendant argues, however, there was no named victim of the burglary. He cites *People* v. *Miller*, *supra*, 18 Cal.3d 873. There, the information expressly alleged the defendant robbed John Keating. (*Id.*, at p. 879.) It also alleged the defendant committed a burglary in the course of which he inflicted great bodily injury on Charles Burk. (*People* v. *Miller*, *supra*, 18 Cal.3d at p. 882.) In holding that the multiple victim exception applied, the Supreme Court explained: "[T]he victim of the robbery as *alleged, proved and found to be true* was John Keating who was accosted and threatened at gunpoint. . . . [T]he burglary *alleged, proved and found to be true* is a crime of violence committed against Burk. Defendant being convicted of a second crime of violence against a second victim, [Penal Code] section 654 does not preclude the imposition of punishment for both the robbery and the burglary convictions." (*Id.*, at p. 886, italics added, fn. omitted; see also *In re Ford*, *supra*, 66 Cal.2d at pp. 183-184 ["Petitioner was properly sentenced on both the kidnaping count and the robbery count because the People alleged and proved and the jury found that he kidnaped victims A, B, and C for the purpose of robbery (count I) as well as robbing C (count II)."].)

Here, by contrast, the information did not allege, and the jury did not find, that any particular person was the victim of either the burglary or the related

personal firearm use enhancement. Defendant concludes the multiple victim exception cannot apply. We think this reads too much into *Miller.* Certainly under *Miller,* if it has been alleged, proved, and found true that the defendant committed violent crimes against multiple named victims, this is sufficient to invoke the multiple victim exception; but *Miller* does not hold this is necessary.

We know of no case in which the court declined to apply the multiple victim exception simply because the victims had not been named in the information. Ordinarily, in determining whether Penal Code section 654 applies, the trial court is entitled to make any necessary factual findings not already made by the jury. (See *People* v. *Osband* (1996) 13 Cal.4th 622, 730-731 [55 Cal.Rptr.2d 26, 919 P.2d 640], cert. den. (1997) 519 U.S. 1061 [117 S.Ct. 696, 136 L.Ed.2d 618].) Moreover, a number of cases have upheld the application of the multiple victim exception based on evidence of multiple victims, without considering whether the identities of those victims had been pleaded. For example, in *People* v. *Cruz* (1995) 38 Cal.App.4th 427 [45 Cal.Rptr.2d 148], the defendant fired four shots toward a security guard who was standing inside a doorway. (*Id.,* at p. 431.) He was convicted of assault with a firearm, and discharging a firearm at an occupied building. (*Id.,* at p. 430.) The appellate court held the multiple victim exception applied. It noted evidence that the guard had tried to move " 'children and other people' " who were standing near the door away. It concluded the guard was the only victim of the assault, but there were other victims of the discharge of a firearm at an occupied building. (*Id.,* at pp. 434-435; see also *id.,* at p. 431.) It seems unlikely that the "children and other people" had been alleged as additional victims. In any event, the court discussed only the evidence; it did not find it necessary to discuss the allegations or the findings. (See also *People* v. *Gutierrez* (1992) 10 Cal.App.4th 1729, 1736-1737 [13 Cal.Rptr.2d 464] [multiple victim exception allows multiple punishment for discharging firearm at an occupied vehicle and for attempted murder of one of the passengers; evidence at preliminary hearing gave defendant notice of multiple victims].) Here, the trial court could properly find multiple victims even though the information did not specify, and the jury did not make any finding regarding, the identity of any victim of the burglary or the personal firearm use.

Finally, the trial court's implied finding of multiple victims is supported by substantial evidence. Indeed, defendant does not argue otherwise. Raines was indubitably the victim of the kidnapping. Grundman was the victim (or at least a victim) of the burglary, because she lived in the home. (See *People* v. *Davis* (1998) 18 Cal.4th 712, 720-722 [76 Cal.Rptr.2d 770, 958 P.2d 1083], and cases cited [burglary statute protects occupant's possessory

interest in building].) Grundman also was a victim of defendant's menacing display of a firearm during the burglary. It could be argued that Raines, too, was a victim of the burglary and the personal firearm use. Nevertheless, there was at least one victim of the burglary and the personal firearm use who was not also a victim of the kidnapping. This was sufficient. (*People* v. *Miller*, *supra*, 18 Cal.3d at p. 886, fn. 11; *People* v. *Garcia*, *supra*, 32 Cal.App.4th at pp. 1784-1785; *People* v. *Robinson*, *supra*, 198 Cal.App.3d at p. 681; *People* v. *Masters* (1987) 195 Cal.App.3d 1124, 1128 [241 Cal.Rptr. 511].)

We conclude the trial court did not err by imposing separate and unstayed sentences for the kidnapping and the burglary.

## VI

### DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and Hollenhorst, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 6, 1999. Mosk, J., was of the opinion that the petition should be granted.