Filed 4/29/14  P. v. Ornelas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038211 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1112602) |
| v. | |
| JUAN ANTONIO ORNELAS, | |
| Defendant and Appellant. | |

Defendant Juan Antonio Ornelas robbed a jewelry store and, during the robbery, stabbed the jewelry store's owner multiple times, inflicting several wounds to the victim's throat.  As the victim lay bleeding on the floor, Ornelas ransacked the store, took the key to the victim's car from his pocket and drove away.  Ornelas was quickly apprehended because he had previously given the store owner his first name and cell phone number which was written down on an envelope in the store.  Video surveillance cameras in the store also recorded the event.

A jury convicted Ornelas of attempted murder (Pen. Code, §§ 664, 187, count 1),[1] second degree robbery (§§ 211, 212.5, subd. (c), count 2), second degree burglary (§§ 459, 460, subd. (b), count 3), and theft or unauthorized use of a vehicle (Veh. Code, § 10851, subd. (a), count 4).  The jury found not true the allegation that Ornelas acted willfully, deliberately, and with premeditation in committing the attempted murder (§§ 664, 187, 189).  However, the jury did find true the remaining allegations that Ornelas, in

_____

[1] Further unspecified statutory references are to the Penal Code.

connection with counts 1 through 3, personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a deadly and dangerous weapon (a knife) (§ 12022, subd. (b)(1)).

Ornelas was sentenced to a total term of 14 years in state prison.

On appeal, Ornelas contends the trial court violated section 654 when it imposed separate punishments for: (1) the auto theft; and (2) the robbery.

We reject Ornelas's arguments and will affirm.

I.    FACTUAL AND PROCEDURAL BACKGROUND

A.    *The prosecution's case*

On August 1, 2011, San Jose police responded to a report of an armed robbery at a jewelry store. When they arrived at the address, they met Alberto Gomez outside, who told them his father had been stabbed. Inside the store, Victorio Gomez was lying on the ground, bleeding heavily from several knife wounds, three to five of which were on his neck. The first officer to enter the store testified he saw two large pools of blood on the floor, one of which was three and a half feet in diameter. The officer applied pressure to Victorio's neck wounds until paramedics arrived and assessed Victorio's other injuries. The officer, who had 22 years experience and had investigated more than 100 violent crimes, was certain Victorio would die given the amount of blood he had lost.

Victorio was transported to the hospital where he was successfully treated for his injuries. One of the officers at the crime scene was informed that Victorio had written down his attacker's first name and telephone number on an envelope which was on the desk at his store. The officer was also advised that Victorio kept a handgun in the desk drawer. After about 10 minutes of searching, the officer found the envelope and relayed the information to a dispatcher to see if they could get a full name and address for the suspect. The officer could not locate Victorio's gun, but did find an empty holster and ammunition.

2

The jewelry store was equipped with video surveillance cameras. Once paramedics began treating his father, Alberto and another officer reviewed the video recordings to see who had attacked Victorio. In those recordings, Ornelas is seen entering the store earlier in the day and talking to Victorio for 30 to 40 minutes. The recording shows Ornelas leave and then return about 15 minutes later, after it is dark outside. Ornelas followed Victorio towards the work area in the back of the store, then as Victorio turns around, Ornelas hits him. Another recording showed Ornelas had stopped by the store a few days earlier, for about 10 minutes.

On August 2, 2011, Ornelas was arrested at the Wendy's restaurant where he worked.

Maria Estela Garcia Cabrera testified she had been married to Ornelas since May 2010 and they were still married on August 1, 2011. She said Ornelas had that day off and came home at 10:00 p.m. She did not know where he had been earlier, but said he was not acting strangely. She did not speak to him because they had been fighting a lot lately, due to the fact that he never had money to pay the rent or buy diapers for their (then) four-month old son. After Ornelas got home that night, she left him with their son and went with a friend to get money out of the bank to pay the rent. Cabrera said she was not aware at the time that Ornelas had been borrowing money from anyone. When she returned from the bank, Ornelas was watching television. Cabrera took a bath and went to bed.

Cabrera said she never had a conversation with Ornelas about getting a gold bracelet for their son. He did call her on the afternoon of August 1, 2011, but simply asked her where she was.

On cross-examination, Cabrera said Ornelas has always had two jobs and works hard. Over the 10 years she has known him, she has never seen him get into fights, or get into trouble with the law.

Victorio's wife, Teresa, testified she was at home on the evening of August 1, 2011, waiting for Victorio to come home from the store. At some point after 7:00 p.m., she called him to see why he was late. Victorio told her he was waiting for a client and would be home a little later. Teresa called him twice more that evening and each time Victorio said he was still waiting for the customer to arrive. After a number of minutes passed, Teresa called a fourth time but this time the phone rang many times before Victorio answered. He told her to have their son call the police because he had been stabbed and was bleeding. She told Alberto to call the police and then the two of them went to the store. Alberto went inside first and would not let her enter.

Alberto testified he was at home with his mother on the evening of August 1, and she called Victorio to see where he was. She began screaming at him to get to the store because Victorio had been wounded and was bleeding. When he arrived at the store, the door was unlocked, but he could not see anyone inside. As he entered the work area in back, he saw Victorio lying on the floor, bleeding profusely, with his eyes rolled back in his head. Alberto called 911 and applied pressure to Victorio's neck wound.

Victorio, who was 63 at the time of trial, testified Ornelas first came into his store on July 28, 2011 and asked him about having a gold bracelet made for his child. Ornelas told him he had some gold Victorio could use to make the bracelet and would come back another time. Victorio asked for Ornelas's telephone number which he wrote down, along with Ornelas's first name, on an envelope.

On August 1, 2011, Victorio called Ornelas to see if he was still planning on having a bracelet made. Ornelas asked if he could meet Victorio at the shop at 7:30 p.m., 30 minutes after the shop's normal closing time, because he claimed he did not get off work until 7:30 p.m. Around 7:30 p.m., Ornelas arrived and said he needed to call his wife to bring the gold for the bracelet. Ornelas seemed to call someone on his phone and Victorio heard him say, "Bring the gold." They waited about half an hour, and no one

4

showed.  In the meantime, Teresa called and asked Victorio where he was and he explained he was working with a customer.

Ornelas said he would call his wife again and appeared to call someone.  When no one arrived after a number of minutes, Victorio suggested they do it another day.  Ornelas said he would go get the gold himself, and Victorio agreed to wait.

About 20 minutes later, Ornelas returned and claimed he had the gold with him.  Victorio headed towards his work bench, and Ornelas slashed his neck.[2]  Victorio grabbed for the knife, but the blade cut his finger and he had to let go.  Ornelas repeatedly stabbed Victorio in the neck and scratched his stomach with the knife.  Victorio tripped over some furniture and fell to the floor, where Ornelas started to strangle him.  Victorio somehow managed to regain his footing and tried to get to the gun he kept in his work bench, but could not reach it.

Ornelas grabbed Victorio's arm and said, "You're trying to fuck me up."  He put Victorio in a headlock and Victorio lost consciousness for a period of time.  When he came to, he tried to call 911 but could not get the phone to work.  Teresa called and Victorio was finally able to answer the phone and tell her he had been attacked.  He remembers later waking up in the hospital, where police officers asked him questions.  Victorio identified Ornelas as his attacker when shown a photo lineup.  Victorio described the knife Ornelas used as thin and black, without a serrated edge, and said it looked like a kitchen knife.  Before trial, a detective showed him a knife, but he could not identify it as the one Ornelas used.

Victorio suffered a fractured rib, and multiple stab wounds, including several to his neck.  He was given four units of blood in the emergency room, and was placed on "massive transfusion blood protocol."

---

[2] In court, Victorio watched the video footage and confirmed that it showed the beginning of the assault.

Ornelas took $700 or $800 in cash from Victorio's pockets, along with various pieces of jewelry from the store. Ornelas also took the key to Victorio's BMW. Victorio testified that Ornelas attacked him without first asking him for money or gold. He did not recall telling police officers that Ornelas first demanded that he hand over his property before stabbing him. However, Victorio spoke to officers at the hospital after the attack and could not remember everything he said to them at the time.

Officer Jose Rodriguez testified that he interviewed Victorio at the hospital. According to Rodriguez, Victorio told him Ornelas brandished a knife and demanded his money and gold. Victorio gave Ornelas the money in his pocket and told him he could take anything he wanted. Ornelas then stabbed him.

Officer Jesus Mendoza interviewed Ornelas following his arrest. Ornelas said he originally intended to rob the jewelry store on July 28, 2011, but changed his mind. After Victorio called him on August 1, 2011, to ask about the bracelet, Ornelas told him he was still interested and wanted to know what time the shop closed. Ornelas went to the store at about 7:30 that night and pretended to call his wife to bring the gold for the bracelet. He left the store and walked around for 20 minutes before returning. Ornelas said when he got back inside the store, he demanded money from Victorio before stabbing him. Ornelas thought he had killed Victorio. He then took jewelry and Victorio's gun from under the counter and put them in a backpack. Ornelas drove off in Victorio's car.

Ornelas had an extra set of clothing, so he changed his clothes and dumped the backpack with all its contents at a garbage can near a specific bus stop. He left the car in the parking lot of a Home Depot. At the end of the interview, Ornelas wrote a letter to Victorio apologizing.

That evening, police found Victorio's car where Ornelas said he left it. However, they could not find the backpack or any of the stolen items in the garbage can that Ornelas had identified. The officers later found the stolen jewelry in a plastic bag that was wrapped in a sweatshirt at the Wendy's where Ornelas worked.

6

In November 2011, Marisol Nunez, who worked at Wendy's with Ornelas, found a long, thin knife at the restaurant in the corner of a metal cabinet underneath a sink, i.e., an area that the employees rarely checked. The knife was turned over to police.

Evangelina Cervantes Sanchez testified she met Ornelas through his wife and he asked to borrow $500 from her in February 2011, claiming to need the money for rent, for a car payment and to pay his wife's medical bills. Though she did not have $500, she did loan him $250, which was a significant amount of money to her. About three months later, Sanchez began asking him about repaying the loan, and Ornelas repeatedly told her he would give it to her "someday."

The parties stipulated that the forensic criminalist tested the sweatshirt found at the Wendy's restaurant. The left cuff had a mixture of blood from two contributors whose identities were uncertain, but there was a "strong inclusion" that the blood belonged to Ornelas and Victorio.[3] The right cuff had Ornelas's DNA on it and there was an inclusion[4] of DNA from Victorio. Ornelas's DNA was on the hood of the sweatshirt.

### B.    *Defense case*

Ornelas testified on his own behalf. In April 2011, he began having financial problems when he was laid off from one of his jobs. He had trouble paying the rent, as well as making the payments on a truck he had bought. He also had increased expenses because his wife gave birth to their son that year. Ornelas began borrowing money from friends and family members, but his job at Wendy's did not allow him to cover his expenses and repay the money he owed. When people began asking to be repaid, Ornelas became stressed and began losing weight. He never told his wife how serious their financial problems were.

---

[3] A "strong inclusion" is a step directly below identification.

[4] An inclusion is a step below "strong inclusion."

7

Ornelas admitted he robbed and stabbed Victorio. He thought about robbing Victorio when he first entered the store in late July to talk to him about buying a bracelet for his son, but changed his mind. When he returned to the store on August 1, he pretended to call his wife, then left and went to the liquor store next door. He again thought about robbing Victorio in order to pay off his debts, and sat down on a bench across the street. He saw a knife on the ground and picked it up. He took the knife with him when he reentered the jewelry store.

Once inside, Ornelas pulled out the knife and asked Victorio for money. Victorio grabbed Ornelas's wrist and tried to take the knife away. They began struggling. Ornelas was scared and tried to get away, but Victorio put him in a headlock and took him to the ground. Victorio then tried to get his gun, and Ornelas grabbed him, falling on top of him. Victorio started to strangle Ornelas, and Ornelas began to choke. Ornelas stabbed Victorio several times, swinging wildly in an attempt to get Victorio to let him go. Victorio let go, and Ornelas saw that he was bleeding. There was a lot of blood coming from Victorio's neck and Ornelas felt bad, thinking he had killed him. Because he was stressed and nervous, he did not call 911.

For the next 10 to 15 minutes, Ornelas ransacked the store, taking jewelry from the counter and from envelopes. He took the gun from the drawer and put all the items in the backpack. Ornelas went through Victorio's pockets, took the keys to his car, and drove off. He parked Victorio's car at Home Depot, took off his bloody sweatshirt and walked home. Along the way, he left the backpack containing the gun and the knife near a garbage can. He admitted lying to the police about also leaving the jewelry in that backpack. When he got home, he gave the stolen cash[5] to his wife.

_____

[5] In a response to a juror's question, Ornelas said Victorio handed the money over to him, though he did not specify when that occurred.

Maribel Garcia, Ornelas's sister-in-law, testified she knew he was having financial problems in 2011.  That year, she could see that Ornelas was losing weight, and he looked sickly and depressed.  Over a one-month period, he asked to borrow money three different times and each time she agreed, lending him a total of $2,500.  Ornelas asked her not to tell his wife about the debt and Garcia agreed to keep it a secret.  At the end of July 2011, Garcia asked him to pay her back, but he did not.

Rodolfo Cervantes Vazquez, Ornelas's uncle, testified he knew Ornelas began having financial problems after he got married in 2011.  Within the past year, prior to Ornelas being arrested, Vazquez gave or loaned him a total of about $2,000.  Vazquez said his brother also loaned Ornelas some money.

Espiridion Cervantes Alonzo, Ornelas's grandfather, gave Ornelas a total of about $700 in 2011.  The week before he was arrested, Ornelas asked him for $1,500, but Alonzo did not have the money.

*C.        Verdict and sentencing*

The jury found Ornelas guilty of attempted murder (§§ 664, subd. (a), 187, count 1), second degree robbery (count 2), second degree burglary (count 3) and theft or unauthorized use of a vehicle (count 4).  With respect to the attempted murder, robbery and burglary charges, the jury found true the special allegations that Ornelas personally inflicted great bodily injury on Victorio and personally used a deadly or dangerous weapon in committing those offenses.  The jury found not true the special allegation that Ornelas acted willfully, deliberately and with premeditation in committing the attempted murder, however.

The trial court sentenced Ornelas to an aggregate term of 14 years in prison, which included the aggravated term of nine years on count 1 (attempted murder), three years for the personal infliction of great bodily injury enhancement (§ 12022.7, subd. (a)), one year for the personal use of a deadly or dangerous weapon enhancement (§ 12022, subd. (b)(1)), one year (one third the middle term) on count 2 (second degree robbery), and a

9

concurrent term of two years on count 4 (auto theft). Pursuant to section 654, the trial court stayed the sentence on count 3 as well as the sentence enhancements on counts 2 and 3.

## II.    DISCUSSION

### A.    Auto theft sentence

Ornelas argues the trial court erred by failing to stay the concurrent two year sentence for auto theft pursuant to section 654. The theft of Victorio's BMW was part of an "indivisible transaction" and thus Ornelas should not be subject to multiple punishments. We disagree.

#### 1.    Statutory principles and standard of review

Section 654 provides in part, "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

"[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) If all the offenses were incident to one objective, the defendant may not be punished for more than one, e.g., a defendant who attempts murder by setting fire to the victim's bedroom could not be punished for both arson and attempted murder, because his primary objective was to kill, and the arson was the means of accomplishing that objective and thus merely incidental to it. (*Ibid.*) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct."

10

(*Ibid*.) For example, the objectives to drive while intoxicated and to drive with a suspended license were separately punishable, though they occurred simultaneously. (*Id*. at p. 552.) The purpose of the protection against multiple punishments is to insure that the defendant's punishment will be commensurate with his criminal culpability. (*Id*. at p. 552, fn. 4.)

It is generally a factual question for the sentencing court whether a defendant's multiple crimes involved multiple objectives. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) When the trial court makes no express findings on the issue, its imposition of separate sentence terms may constitute an implied finding that the offenses were divisible. (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

2. *The robbery and auto theft sentences were not subject to section 654*

Ornelas relies principally on *People v. Bauer* (1969) 1 Cal.3d 368 (*Bauer*) where the Supreme Court found, under the facts presented in that case, separate sentences for robbery and car theft violated the section 654 prohibition on double punishment. In *Bauer*, the defendant and an accomplice entered the home of three elderly women whom they tied up and blindfolded. The two robbers ransacked the house, carrying the loot to the garage, before driving away in a car belonging to one of the victims. (*Bauer*, *supra*, at p. 372.) Defendant was convicted and sentenced to concurrent terms for robbery and car theft. (*Ibid*.) The Supreme Court found the transaction was a single, indivisible course of criminal conduct, because the defendant, who carried the property to the car in the course of the robbery, evidently intended all along to take the car and drive away with his loot. (*Id*. at p. 377.) The court rejected the People's argument that since the robbery was complete before the car theft the acts were sufficiently independent to warrant separate punishment. The court stated, "where a defendant robs his victim in one

11

continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible." (*Ibid.*) "Moreover, the evidence in the instant case does not show that the theft of the car was an afterthought but indicates to the contrary that the robbers, who while ransacking the house were carrying the stolen property to the garage, formed the intent to steal the car during the robbery if not before it." (*Ibid.*)

The instant case is distinguishable from *Bauer*. Here, Ornelas intended to rob the jewelry store. Ornelas testified to having no other intent at any time prior to or during the robbery. Since he was apparently unwilling to break into the store when it was unoccupied, Ornelas employed a ruse to convince Victorio to let him in after hours. Robbing Victorio of what was in his pockets and looting the store of jewelry was a continuous transaction. It was only by rifling through Victorio's pockets, however, that Ornelas discovered there was another item of property he could take--Victorio's car.

Unlike the defendant in *Bauer*, it does not appear Ornelas formed the intent to take the victim's automobile prior to or during the robbery. He was not carrying loot to the car during the robbery. There is no evidence that Ornelas even knew Victorio used a car to get to the store, let alone that it would be parked nearby so that it could be used as a getaway vehicle. Since everything Ornelas took from the store fit into a backpack, a vehicle was not even necessary to transport what he had stolen. Rather, it was only upon discovering the key in Victorio's pocket that Ornelas formed the separate intent to use Victorio's BMW to flee the scene.[6] This conclusion is further supported by the fact that Ornelas quickly abandoned the car, rather than attempting to sell it, which presumably he would have done had it been part of his original plan to come up with money to support his family as well as pay his rent and outstanding debts. Accordingly, we find substantial evidence supports the trial court's implied finding that Ornelas harbored a separate intent

---

[6] No one asked Ornelas about his original escape plan, assuming he had one.

12

and objective in taking Victorio's automobile upon discovering the keys during the robbery.

> 3.  *The attempted murder and robbery sentences were not subject to section 654*

Ornelas further argues the trial court erred by not staying the sentence on his conviction for second degree robbery because the robbery and the attempted murder were part of an indivisible transaction. Ornelas only intended to rob Victorio, not kill him, and the robbery took place only after Victorio had been stabbed and was unable to resist.

Ornelas relies on cases which hold a defendant should not be separately punished for taking property by robbery, burglary or theft when that objective is accomplished by means of assault or murder. (See *People v. Meredith* (1981) 29 Cal.3d 682, 695-696 [victim shot to death while resisting a robbery]; *People v. Glaude* (1983) 141 Cal.App.3d 633 [one victim shot and killed, another kidnaped, in course of robbery].)

In other cases, however, appellate courts have upheld findings that a separate intent was manifest in the assault or murder even where those crimes were coincident with a taking of the victim's property.

In *People v. Nelson*, *supra*, 211 Cal.App.3d 634, the appellate court upheld the imposition of terms for two assaults consecutive to a burglary term. In the course of a burglary, the two burglars encountered the two occupants of the house and engaged in a somewhat prolonged physical confrontation. The appellate court reasoned: "On this record, it is reasonable to infer, as we assume the trial judge did, that theft was not the burglars' only object and purpose. Rather, they deliberately chose to enter the McLeod residence while the victims were at home, knowing as they must that their presence reduced the chances of a successful theft, because separate and apart from thievery they intended to inflict physical harm upon the victims." (*Id.* at p. 639.)

In other cases, the timing of the assault relative to the taking appears to be less important than the necessity for the assaultive action, or more precisely, the lack thereof.

13

In *People v. Jenkins* (1987) 196 Cal.App.3d 394 (disapproved on another ground by *People v. Brown* (1993) 6 Cal.4th 322, 336, fn. 12), the defendant brandished a handgun and demanded money. The defendant fired a shot at the victim when the victim initially denied having money and fired a second shot at the victim after collecting the victim's money. The appellate court concluded: "Appellant contends that both shots were fired with the same objective, to facilitate the robbery. We disagree. The second shot was completely unnecessary to the robbery, and appears to have been a gratuitous act of violence." (*People v. Jenkins*, *supra*, at p. 406.)

In *People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*) the appellate court concluded there was substantial evidence to support the sentencing court's implied finding of divisibility. The defendant in that case remained near the cash register, while an accomplice took the victim into a back room. After taking the victim's belongings, the accomplice made the victim lie on the floor before shooting and killing him. "This act constituted an example of gratuitous violence against a helpless and unresisting victim which has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654." (*Id.* at p. 190.) "The defense nevertheless argues Penal Code section 654 bars multiple sentences here because the facts suggest the clerk was shot in order to eliminate him as a witness or to facilitate the assailants' escape. Perhaps; but at some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and a more sinister goal than mere successful commission of the original crime." (*Id.* at p. 191.) "It is one thing to commit a criminal act in order to accomplish another; Penal Code section 654 applies there. But that section cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense." (*Ibid.*)

*People v. Cleveland* (2001) 87 Cal.App.4th 263, 272 (*Cleveland*) quoted *Nguyen* with approval and held: "Sufficient evidence existed for the court to conclude Cleveland

14

harbored divisible intents in committing two separate crimes--robbery and attempted murder of Freeman. We do not agree with Cleveland that both crimes were committed pursuant to the intent to rob Freeman of his Walkman. As the trial court observed, the amount of force used in taking the Walkman was far more than necessary to achieve one objective. Cleveland repeatedly hit his 66-year-old feeble, unresisting victim on the head and body with a two-by-four board. Cleveland struck Freeman until the board broke and left him unconscious. While it is true that attempted murder can, under some circumstances, constitute the 'force' necessary to commit a robbery, here, it was not the necessary force." (*Id.* at pp. 271-272, fn. omitted.) "The finding Cleveland had separate and simultaneous intents is further bolstered by the evidence that Cleveland and Freeman had a history of negative interaction." (*Id.* at p. 272.)

We agree with this line of cases which hold that even where a defendant's initial objective appears to be the taking of another person's property or money, evidence of violence or any other conduct by the defendant unnecessary to accomplish the taking may support a finding that the defendant developed a separate and different, though perhaps simultaneous, intent.

Ornelas seeks to distinguish *Cleveland* on the grounds that he and Victorio had no "history of negative interaction" which would explain Ornelas's violent assault. (*Cleveland*, *supra*, 87 Cal.App.4th at p. 272.) We are not persuaded. The prior history between the victim and the defendant in *Cleveland* was *additional* evidence to support the trial court's finding of separate intents in that case. It was not the only, let alone the decisive, evidence to support that finding. Rather, what matters is the amount of force used or the nature of the coinciding assault. Did the defendant use force sufficient to commit the robbery or was the amount of force employed above and beyond that reasonably necessary to take the victim's property, thereby transmuting the act into something more? An offense committed to achieve another offense may "at some point . . . become so extreme [that the other offense] can no longer be termed 'incidental' and

15

must be considered to express a different and a more sinister goal than mere successful commission of the original crime." (*Nguyen*, *supra*, 204 Cal.App.3d at p. 191.)

In this case, the evidence supported two possible scenarios:[7] (1) Ornelas, upon returning to the store and beginning to follow Victorio to the back room, attacked him and slashed him in the neck without warning, then continued to stab and slash him until he lay helpless on the floor, bleeding profusely; or (2) Ornelas returned to the store, brandished the knife and first demanded money before attacking Victorio (who may or may not have complied with the demand before being attacked). In either event, the vicious attack on Victorio went well beyond the force necessary to accomplish the robbery of his store. Substantial evidence supports the trial court's implied finding that Ornelas harbored a separate intent and objective in attacking the victim in this case.

---

[7] Because it was obviously rejected by the jury, we do not consider Ornelas's version that he stabbed Victorio in self-defense after Victorio tried to take the knife from him and began choking him.

**III. DISPOSITION**

The judgment is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.

17